**In re the Marriage of Mary McKEE–JOHNSON, Respondent,**

**v.**

**Lance J. JOHNSON, Petitioner, Appellant.**

**Nos. CX–87–2412, C0–88–565.**

Supreme Court of Minnesota.

Aug. 18, 1989.

Robert W. Due, Katz, Davis, Manka & Haugan, Ltd., Minneapolis, and Jack S. Jaycox, Jack S. Jaycox Law Offices, Bloomington, for appellant.

Phillip Gainsley, Susan C. Rhode, Moss & Barnett, Minneapolis, for respondent.

Family Law Sections, Minnesota State Bar Ass'n & Minnesota Trial Lawyers Ass'n, Lorraine S. Clugy, Linda Aaker, Karen I. Haukebo, Bloomington, amicus curiae, Judith T. Younger, Professor of Law, Minneapolis, amicus curiae.

KELLEY, Justice.

The primary issue in this marriage dissolution case relates to the validity of provisions of an antenuptial contract which purport to allocate marital, as well as nonmarital property between the parties. Lance Johnson appeals from that part of the court of appeals' decision which affirmed the trial court's conclusion that those provisions of the contract relating to distribution of marital assets were void and unenforceable as a matter of law.[1] Because we conclude that such provisions were not void as a matter of law, as held below, we vacate the decision of the court of appeals. We hold appellant has met his burden of establishing the procedural fairness requirement necessarily antecedent to, and contemporaneous with, the inception of the contract. However, we remand to the trial court for further findings respecting substantive fairness requirements both at the inception and at the time of the dissolution.

At the time of their marriage, on June 14, 1980, Lance Johnson was 40 and Mary McKee–Johnson was 37 years of age. Each had been previously married and divorced. Each had children by the prior marriage. Each was well educated and engaged in established independent careers. Lance, admitted to practice law since 1965, was in the process of undergoing a career direction change from private law practice to a career with an emphasis on real estate development and investment. Mary, who had been steadily employed since school days, with the exception of a maternity leave, had a B.S. degree in nursing from the College of St. Catherine and an M.S. degree in nursing from the University of Minnesota. In 1980 she was well established professionally, had received scholarships and other awards during her career, and was a director of nursing programs at Inver Hills and Lakewood Community Colleges. Her duties as an administrator required that she have familiarity with contracts, grant applications, formal and informal operation agreements, resolutions and business documents of a similar nature.

Commencing some time prior to the marriage, the parties had on occasion talked about executing an antenuptial agreement. Although the evidence reflects some dispute between the parties relative to the timing and frequency of those conversations, it clearly appears that the subject was discussed by them on more than one occasion. The parties likewise appear to have somewhat different recollections with respect to his or her understanding of the contents and "coverage" of such an agreement. However, both agree that Lance encouraged Mary to obtain personal, independent legal advice relative to such a contract. He originally suggested that Mary seek advice from her brother, who was an attorney. She declined to do so either because she felt uncomfortable discussing with a family member their financial situation or the fact that Lance was insisting that they enter into a prenuptial agreement. Lance claims he also "insisted" that Mary consult with an attorney of her own choice at his expense. Whether or not he "insisted," at least he did make the offer. Although Mary rejected Lance's suggestion and declined to seek separate legal counsel, she either did suggest, or at least acceded to, the retention of Larry Johnson, a friend of Lance's and a member of the Dorsey and Whitney law firm, who concentrated his practice in the area of estate planning administration, as the scrivener of

1. *McKee–Johnson v. Johnson,* 429 N.W.2d 689, 693 (Minn.App.1988). At trial, custody, property division, and attorney fees were contested. In the court of appeals, Lance Johnson continued to contest those issues as well as child support. The court of appeals affirmed the trial court on all issues and, in particular, ruled that by enactment of Minn.Stat. § 519.11 (1988), the legislature intended to prohibit contracts respecting allocation of marital property. By his petition for further review in this court, Lance Johnson raised only the issue of the validity of the antenuptial agreement relating to marital property. In granting the petition for further review, we solicited amici briefs from the University of Minnesota law professor Judith T. Younger, the Family Law Section of the Minnesota State Bar Association, and the Family Law Section of the Minnesota Trial Lawyers Association.

the prenuptial agreement. At two meetings with Larry Johnson in May 1980, before leaving on a fishing trip, Lance discussed terms to be included in the proposed agreement. Mary was present at neither meeting, but, while Lance was on his fishing trip, about ten days before the scheduled wedding, she received in the mail from Larry Johnson a draft of the proposed agreement. Thereafter, as she read it, she marginally made notations on the copy she had received.

Upon Lance's return from the fishing trip, the parties between themselves again discussed the agreement. Later, on June 10, 1980, both met with Larry Johnson at his office. The purpose of the meeting was to give Mary an opportunity to ask any questions she had concerning the proposed agreement. Initially, the conference included Larry Johnson and both Lance and Mary. Shortly after its commencement, however, Lance withdrew so that Mary could consult privately with Larry Johnson. At the outset of the meeting, Larry Johnson clearly informed Mary she had a statutory right to be separately represented, and that he would prefer that she seek separate representation. In her testimony at trial, Mary acknowledged that she was so informed and advised by Larry Johnson to seek independent counsel, but that she had rejected his advice. Indeed, in her deposition she conceded she didn't know what more Larry Johnson could have done to advise her of her right to independent representation.

After Mary declined to seek independent counsel, Larry Johnson discussed with her the legal import of the agreement's terms. At trial Larry Johnson testified that he explained the concept of marital property and that he specifically advised Mary that under the proposed contract she would be entitled to no interest in any of Lance's property, whether acquired before or after marriage. Indeed, the agreement itself

specifically and clearly so provides. While Mary admits that she was told her rights would be different without the agreement, she disputes that any terms of the proposed contract were specifically defined. Nonetheless, after she had read the agreement, made notes on the margin, sought and secured a language change with respect to joint property, and been afforded the opportunity to question Larry Johnson without interruption or interference from Lance, she did sign the agreement which, in paragraph 4, defines "property" and "estate" with specificity, and, in particular, refers to after acquired property. Larry Johnson answered all questions raised by Mary, explained to her the allocation of property on death or divorce without the proposed agreement, and, to meet one of her expressed concerns, drafted a modification to the draft respecting jointly owned property. Larry Johnson did not, however, "pressure" Mary to sign the agreement, and, in fact, did not recommend to either party that the proposed agreement should be executed.

Attached to the antenuptial agreement at the time of the execution were schedules disclosing the income, assets, and liabilities of each party. The schedules revealed that Lance had net assets of approximately $1,400,000 while Mary's net assets approximated $100,000. Neither party claims that there was not full and complete disclosure of earnings, property, or financial condition.

■ Because the courts below held as a matter of law that provisions of an antenuptial agreement directing the distribution of marital property were void and unenforceable, we first direct our inquiry to determine whether Minn.Stat. § 519.11 (1988) precludes provisions in an antenuptial contract affecting disposition of marital property on dissolution of the marriage or death of a party.[2]

2. Mary does not contend, nor did the courts below hold, that provisions in the antenuptial agreement which governed disposition of the nonmarital property of the parties, were invalid. Mary's counsel, however, in briefs filed below and in this court argues that the statute only

validates antenuptial agreements dealing with disposition of nonmarital property. Yet, at oral argument, he seemingly retreated from that position when, in response to a question posed by a member of the court, he acknowledged that Minn.Stat. § 519.11 did not prohibit provisions

In 1979 the legislature attempted to codify procedural requirements which theretofore under the common law had been considered applicable to the existence of a valid antenuptial agreement providing for the disposition of nonmarital property by the enactment of Laws 1979, ch. 67 § 1 (now codified as Minn.Stat. § 519.11 (1988)). The statute acknowledged the continuing validity and enforceability of such agreements provided that at or prior to the inception of the agreement each party had fully and fairly disclosed earnings and property owned by him or her and that each party had, prior to the signing, been afforded an opportunity to consult with legal counsel—in other words, that each party had been afforded procedural fairness. As indicated below, those same factors of procedural fairness had always existed in the common law of Minnesota respecting premarital agreements. The statute, however, unlike the common law which had placed on the proponent of the agreement the burden of establishing procedural fairness, shifted the burden to the party contesting the validity of the agreement to establish lack of the statutorily defined procedural fairness requirements. Minn.Stat. § 519.11, subd. 5 (1988). In addition, the statute, insofar as pertinent to the issue in this case, provides:

> An antenuptial contract or settlement made in conformity with this section may determine what rights each party has in the nonmarital property, defined in section 518.54, subdivision 5, clauses (a) to (d), upon dissolution of marriage, legal separation or after its termination by death and may bar each other of all rights in the respective estates not so secured to them by their agreement. *This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settle-*

*ment would be valid and enforceable without regard to this section.*

Minn.Stat. § 519.11, subd. 1 (1988) (emphasis added). The court of appeals found the emphasized language acted as a savings clause to preserve that part of an agreement dealing with nonmarital property, while voiding any part of the agreement dealing with marital property. *McKee-Johnson*, 429 N.W.2d at 694 (Minn.App. 1988).

In reaching its conclusion, the court of appeals acknowledged that the emphasized portion of the statute could be construed differently, *id.* at 693, or, in other words, that the language employed by the legislature was ambiguous. We agree that the statutory language is ambiguous, and, that, therefore, resort to legislative history is appropriate to resolve the ambiguity. Minn.Stat. § 645.16(7) (1988); *Sevcik v. Comm'r of Taxation*, 257 Minn. 92, 103, 100 N.W.2d 678, 687 (1959). In referring to that history, we may consider transcripts of taped legislative committee discussions and floor proceedings. *Handle With Care, Inc. v. Dep't of Human Services*, 406 N.W.2d 518, 522 (Minn.1987); *Stearns-Hotzfield v. Farmers Ins. Exch.*, 360 N.W.2d 384, 389 (Minn.App.1985). While we generally treat with caution statements made in committee discussions or during floor debates we do afford some weight to those made by the sponsor of a bill or an amendment relative to the purpose or effect of the proposed legislation. *Handle With Care, Inc.*, 406 N.W.2d at 522. In the instant case, although reference to such legislative history as reflected in tapes of committee or floor debates does not provide us with an absolute or clear cut statement relative to the purpose of the statutory language, we do have various statements of the bill's sponsor made during the course of the bill's progress through the legislative process which afford us some insight into what was being sought by enactment of the bill.

in an antenuptial agreement which disposed of marital property. Notwithstanding that apparent concession, we address the issue because it

was germane to the rulings of both courts below and was argued in briefs filed in this court.

The chief sponsor of the legislation which later became Minn.Stat. § 519.11 was Senator Sieloff. The purpose of the bill was codification of procedural fairness requirements precedent to the execution of a valid antenuptial agreement. *See* Hearing on H.F. 610, Sen. Subcomm. on Judicial Admin., 71st Minn. Legis., Mar. 27, 1979 (audio tape) (comments of Sen. Sieloff). The principal thrust of the bill was directed to procedural fairness at the inception of the contract—that each party had made full financial disclosure, and that each had been afforded opportunity to consult with counsel prior to execution. As originally drafted, the scope of the bill related only to nonmarital property. However, later the House of Representative Judiciary Committee amended the bill to specifically include marital property. 1979 Journal of the House, vol. I, at 412 (reporting March 12, 1979 amendment to H.F. 610). The bill with the amendment was passed by the House without any discussion of the "marital" property amendment. When the bill reached the Senate Subcommittee on Judicial Administration, it was again amended to delete the reference to marital property in response to concerns raised by some senators. However, on the Senate floor, the bill was once again amended by Senator Sieloff to add the last sentence of section 519.11, subdivision 1. He explained that the bill, which now contained his amendment: " * * * does not authorize or increase the authorization for contracting with respect to marital property. The amendment that was tacked on the bill essentially makes this bill neutral as to property acquired during coverture." Sen. debate on H.F. 610, 71st Minn. Legis., April 21, 1979 (audio tape) (statement of Sen. Sieloff).

Actions taken in both houses during committee considerations, as well as Senator Sieloff's statement in the Senate, indicate that the legislature understood that antenuptial contracts concerning both property acquired before or after marriage had been traditionally recognized in Minnesota by the common law. · Nothing that occurred during the legislative process in either the House or the Senate has been asserted by the parties to indicate that the purpose or the effect of the bill was to end the prior right to contract with respect to marital property. The thrust of the bill was directed to codification of procedural fairness requirements in the execution of a valid antenuptial contract and, with respect to nonmarital property, to make it more difficult to subsequently challenge the validity of an antenuptial agreement covering nonmarital property. We find nothing in the legislative history which indicates that the statute was hostile towards agreements which contained provisions relative to the disposition of marital property.[3]

The action of the House in pursuing the bill which then specifically included marital property, and of the Senate which passed the bill after being assured by its sponsor that it was neutral respecting agreements purporting to govern disposition of marital property, demonstrate that both bodies were aware that antenuptial agreements governing nonmarital as well as after acquired property were, if fair, valid and enforceable, both at common law and as regulated by statute. *See* Minn.Stat. § 518.54(5)(e) (1988). We find nothing in the legislative history which justifies the conclusion that the legislature harbored hostility toward the inclusion of provisions respecting disposition of marital property in pre-marital contracts, or that such provisions are void or unenforceable. To the

---

3. Some discussion in the Senate Subcommittee on Judicial Administration reveal that several subcommittee members expressed doubts whether the legislature should sanction premarital contracts purporting to regulate the ultimate disposition of marital property. The concern expressed related more to the inability of a party knowing the extent of future property which, prior to marriage, had not yet been acquired. *See* Hearing on H.F. 610, Sen. Sub-

comm. on Judicial Admin., 71st Minn. Legis., Mar. 27, 1979 (audio tape) (comments of Sen. Dieterich and Sen Tennessen). This discussion, however, in the light of Senator Sieloff's amendment and its explanation on the Senate floor, fails to demonstrate hostility to, or prohibition against, provisions regulating marital property provisions in antenuptial contracts, but rather only suggest some uncertainty as to the scope of the coverage of the statute.

contrary, the statute recognizes the validity of such a contract so long as it "would be valid and enforceable without regard to this section."

Therefore, to determine whether the provisions of this contract relating to "after acquired" property are valid and enforceable, we must look to our common law for guidance. Minnesota has long recognized the validity of antenuptial agreements which altered statutory schemes regulating the disposition of marital property. A number of challenges to such provisions followed the death of one of the signatories to the agreement. Notwithstanding that probate law has historically provided surviving spouses with rights in property of the decedent, we have held that parties contemplating marriage are free to contract away those statutory rights. *See, e.g., Estate of Serbus v. Serbus,* 324 N.W.2d 381, 384 (Minn.1982); *Gartner v. Gartner,* 246 Minn. 319, 343, 74 N.W.2d 809, 813 (1956); *In re Malechow's Estate,* 143 Minn. 53, 57, 172 N.W. 915, 916 (1916); *In re Appleby's Estate,* 100 Minn. 408, 419, 111 N.W. 305, 307 (1907). Moreover, the validity of antenuptial contracts has been upheld even though the agreements specifically related to disposition of marital property so long as certain standards of fairness at the inception are met. *See Hafner v. Hafner,* 295 N.W.2d 567, 570 (Minn.1980) (contract which encompassed property "now owned or hereafter acquired" upheld); *Lenzmeier v. Lenzmeier,* 304 Minn. 568, 571, 231 N.W.2d 71, 74 (1975) (parties' contract covered marital assets, except for homestead, which was outside coverage of the agreement). *See also Hill v. Hill,* 356 N.W.2d 49, 54–55 (Minn.App.1984) (common law allowed antenuptial agreements to include marital property) *pet. for rev. denied* (Minn., Feb. 19, 1985). As the cases demonstrate, premarital agreements, if fairly arrived at, following full disclosure of fi-

nancial condition, and with opportunity to consult independently with counsel, have been favored in the common law of Minnesota—even though marital property was included within their scope.

■ The common law, however, set standards of fairness by which the validity of antenuptial agreements were to be judged. The procedural fairness standards under the common law, as the cases cited above indicate, did not substantially differ from those the legislature included in Minn.Stat. § 519.11, subd. 1 (1988). Under the common law, the proponent of the agreement had the burden of demonstrating the procedural fairness of the agreement at its inception. *See Estate of Serbus,* 324 N.W.2d at 385. Because we hold that Minn.Stat. § 519.11 did not alter common law rules of procedural or substantive fairness applicable to provisions relating to the allocation of marital property, Lance has the burden of establishing the fairness of the contract—both procedurally and substantively. A fairness analysis requires a review of both the procedural and substantive fairness of the contract. The procedural review focuses on determining whether at the inception the agreement was fairly procured, and, under the common law, relevant factors to be considered are substantially identical to those which the legislature codified in Minn.Stat. § 519.11, subd. 1 (1988).[4] However, more amorphous concepts are involved in a substantive review to assess fairness, reasonableness, or conscionability of the terms of the agreement.[5]

■ Under the common law, and, as well, the statute, one standard relative to the procedural fairness requirement is met whenever the proponent has established that the parties voluntarily contracted only after full financial disclosure. *See· Gartner v. Gartner,* 246 Minn. at 323, 74 N.W.2d at 813; Younger, *Perspectives on*

---

4. Some of the standards of the procedural review, without always being identified as such, have been articulated in the cited cases. Professor Judith Younger discusses those and similar standards relative to the procedural review. *See* Younger, *Perspectives on Antenuptial Agreements,* 40 Rutgers L.Rev. 1059, 1074–80 (1988).

5. Professor Younger in her article likewise addresses the substantive fairness analysis. *See* Younger, *supra,* at 1080–1086. *See also Button v. Button,* 131 Wisc.2d 84, 388 N.W.2d 546 (1986), wherein the Wisconsin Supreme Court expressed its views of the substantive fairness analysis.

*Antenuptial Agreements,* 40 Rutgers L.Rev. 1059, 1075 (1988). Attached to the antenuptial agreement in this case were detailed and complete financial statements in which both Lance and Mary disclosed assets, liabilities, net worth, and earnings. Not only have we suggested similar financial disclosures in our cited cases, but the employment of similar detailed financial disclosure has been viewed favorably by the courts of other jurisdictions as well. *See, e.g., Gross v. Gross,* 11 Ohio St.3rd 99, 104, 464 N.E.2d 500, 506 (1984) *appeal after remand,* 23 Ohio App.3d 172, 492 N.E.2d 476 (1985). To so attach those statements, it appears to be an appropriate and practical way in which to comply with the disclosure requirement.[6]

Also implicit in the procedural fairness analysis is the requirement that each party to an antenuptial contract has unrestrained access to advice from independent counsel. The trial court found Mary had waived that right, and, in fact, she acknowledged she did when she signed the agreement containing paragraph 3. Although we would have preferred that the trial court's finding on this issue be more complete, our independent review of the record convinces us that this finding is amply supported by essentially undisputed evidence. Not only did Mary waive that right when she signed the contract, which, in its context, readvised her of her right to seek independent counsel, but also she rejected Lance's initial suggestion that she consult with her lawyer-brother and spurned his later offer to pay the cost of independent consultation with a lawyer.

Mary suggests that it was improper for Larry Johnson, Lance's friend and attorney, to draft the instrument and thereafter advise both parties with respect to its effect. Implicit in that suggestion is the claim that there was not full disclosure,

and, also, that she was deprived of procedural fairness. Though we do observe that Larry Johnson's role in the execution of the contract does highlight some difficulties that may ensue from joint representation, we note that we have never held, nor are we prepared to do so now, that an attorney should never represent both parties seeking an antenuptial agreement. *See, e.g., Estate of Serbus,* 324 N.W.2d at 386. Under some circumstances, not as clear cut as those in this case, such dual representation might be questionable, or perhaps, even fatal, to a proponent's case. Here, however, Larry Johnson encouraged Mary to obtain independent counsel and advised her that he would prefer that she do so. Mary acknowledged receiving this encouragement and conceded that there was little more that he could have done to protect her right to be advised by independent counsel.

From these facts, we conclude that as a matter of law, Lance, as proponent of the antenuptial contract, has sustained his burden of establishing procedural fairness in its inception. Not only was there full financial disclosure, but also Mary was afforded, and rejected, the opportunity to receive independent advice, and, additionally waived her right to consult with independent counsel.

We turn next to consider the substantive fairness of the agreement. Professor Younger has suggested the possible points during the "life" of an antenuptial agreement at which substantive fairness can be reviewed. Those points include the time of execution, the time of enforcement, or both. *See* Younger, *supra,* at 1081–82. Many jurisdictions, perhaps a majority, have opted for a time of execution review, prompted, undoubtedly, by concerns relative to freedom of contract between consenting adults. However, some jurisdic-

---

**6.** Mary asserts that Lance did not make full disclosure because she allegedly did not know the true purpose of the agreement and because she could not know what marital assets would be acquired by the parties, and, that, therefore, assets covered by the agreement were not disclosed. We reject that assertion. Disclosure of present assets, liabilities and financial status is sufficient to meet the disclosure requirement in assessing procedural fairness of the agreement. Were we to accept Mary's contention, if the agreement purports to encompass both marital and nonmarital property, the disclosure requirement obviously could never be met. Mary's complaint about the alleged lack of disclosure about the true purpose of the agreement is more appropriately considered as part of the substantive fairness analysis.

tions have adopted, as part of the analysis, a time of enforcement substantive fairness review as well; that is, the time when the contract becomes operative, in this case, upon dissolution of the marriage. By having a substantive fairness review at the time of enforcement, as well as at the time of execution, some courts have been able to relieve parties from contract provisions, which even though procedurally and substantively fair at the inception, have become unconscionably unfair by the time of enforcement as the result of circumstances originally not foreseen by the contracting parties. However, because a substantive fairness review intrudes upon the right of mature adults to freely contract with respect to the allocation of property and other rights, courts which have employed a substantive fairness review at the time of dissolution, have usually limited invalidation of contract provision to those which could not have reasonably been foreseen, and which have become so one-sided as to be oppressive or unconscionable.[7] In such cases, it has been suggested that review of the analysis must be on a case by case basis. *See, e.g., Button,* 131 Wisc.2d at 96, 388 N.W.2d at 551–52.

Neither the parties nor amici cited any of our prior cases in which we employed a substantive fairness analysis of an antenuptial agreement at the time of enforcement (dissolution). Even though the public policy of the state, as reflected by the common law, has long favored antenuptial agreements, nonetheless, this court has always scrutinized challenged premarital agreements purporting to allot property or limit maintenance for procedural and substantive fairness at the inception. This scrutiny has been prompted by a recognition of the existence of potentiality for overreaching by one party over the other due to the relationship existing between them at the time of the execution. We ascertain no reason why courts should not extend a similar scrutiny to challenged provisions of antenuptial agreements, if the premises upon which they were originally based have so drastically changed that enforcement would not comport with the reasonable expectations of the parties at the inception to such an extent that to validate them at the time of enforcement would be unconscionable.

■■■ Because it ruled that the provisions of the antenuptial agreement relating to marital property of the parties were void as a matter of law, the trial court in this case did not conduct a substantive fairness review, nor did it make findings with reference to unconscionability at either the time of execution or at the time of the dissolution. Therefore, we remand this case to the trial court for appropriate findings. In making such findings, the court should review the substantive fairness of the agreement in the light of circumstances existing at the inception. This will require appropriate inquiry into facts bearing upon the reasonable expectations of each signatory as to the scope and ultimate effect of the contract in the event the marriage should terminate by dissolution. The court should also review, and make appropriate findings, with respect to what effect, if any, the birth of the parties' child, and any sequences of that event, significantly resulted in changed circumstances so as to trigger a further substantive fairness review; or, to state it another way, whether in the light of those facts the enforcement would be oppressive and unconscionable. Because the result in each case hinges on specific facts, we are unable to articulate any precise rules or guidelines to aid trial courts in making such a review. Trial courts engaging in such a review must strike a balance between the law's policy favoring freedom of contract between in-

---

7. *See Uniform Premarital Agreement Act,* § 6, 9B U.L.A. 376–77, comment (1983). Minnesota has not adopted that or a similar act. In a different context, maintenance, the Minnesota Court of Appeals has suggested "unconscionability" as the applicable standard of substantive review at the time of dissolution. *Hill v. Hill,* 356 N.W.2d 49, 57 (Minn.App.1984), *pet. for rev.* *denied* (Minn., Feb. 19, 1985). The employment of an "oppressive" or "unconscionabilitiness" standard in the analysis, it seems to us, more appropriately affords proper weight to the freedom of contract concept by indication that mere or slight unfairness or one-sidedness is insufficient to justify invalidation under the substantive fairness review.

formed consenting adults, and substantive fairness—admittedly a difficult task. *See, e.g., Button v. Button,* 131 Wisc.2d at 96, 388 N.W.2d at 551.[8]

Accordingly, although we hold the provisions of the antenuptial agreement between these parties purporting to allocate distribution of marital property on dissolution was not invalid, void, or unenforceable as a matter of law, we remand to the district court for a review of the substantive fairness as of the time of the execution, and further, if necessary, as of the time of the enforcement.[9]

8. When making such an analysis, we caution the trial court that a premarital agreement need not approximate a division suggested by property division statutes in either the probate court code or in the marital law in order to meet the requirement of substantive fairness. Indeed, one of the goals, if not the primary purpose, of an antenuptial agreement is to alter state-prescribed property rights which would otherwise arise on dissolution of marriage. If the parties to a premarital agreement are limited to state provided property divisions, they would be deprived of their right to contract or to divide their property as they wish. *See* 3 A. Lindey, L.I. Parley, *Lindey on Separation Agreements and Antenuptial Contracts,* § 90-31 (1989).

9. The parties briefed and argued orally before this court the propriety of a post trial award of attorney fees by the trial court. This issue was raised in neither Lance's petition for further review, nor in Mary's response. *See* Minn.R. App.P. 117, subd. 3(a). Therefore, ordinarily we would not address it. However, the court of appeals remanded this issue to the trial court. *McKee–Johnson,* 429 N.W.2d at 695. Inasmuch as we likewise remand the case to the trial court, upon remand the trial court should address the attorney fee issue by the employment of an analysis similar to the substantive fairness review relating to the disposition of property.