GEORGE BAXTER UPHAM *vs.* JEANNE CHARLOTTE LOUISE UPHAM.

No. 92-P-1461.

Middlesex. January 12, 1994. - March 29, 1994.

Present: SMITH, GILLERMAN, & IRELAND, JJ.

*Divorce and Separation*, Division of property, Attorney's fees. *Contract*, Antenuptial agreement. *Husband and Wife*, Antenuptial Agreement. *Practice, Civil*, Appeal. *Evidence*, Prior misconduct.

In proceedings for divorce, the judge's findings and the record on appeal warranted a conclusion that enforcement of an antenuptial agreement at the time of the divorce was not unfair and unreasonable to the husband even if the judge had used the less stringent "conscionability" standard to decide whether the agreement should be enforced, rather than the "fair and reasonable" standard enunciated in *Osborne* v. *Osborne*, 384 Mass. 591, 599 (1981). [299-301]

In proceedings for divorce in which the husband requested an equitable distribution of the marital assets and, as a bar to that request, the wife raised a claim that the parties had executed an antenuptial agreement which settled the division of the marital assets in the event of a divorce, the judge correctly awarded the marital house and its contents to the wife under the parties' antenuptial agreement, where the evidence clearly showed that the house and its contents had been the subject of negotiations between the parties. [301-302]

In proceedings for divorce, the judge did not err in admitting in evidence testimony by the wife of alleged prior "bad acts" committed by the husband and, even if the testimony should not have been admitted, there was no indication that the husband was prejudiced by its admission. [302-303]

An award of attorney's fees or the imposition of double costs was not warranted on appeal in divorce proceedings, where at least one issue raised by the husband on appeal regarding the standard to apply when determining whether antenuptial agreements should be enforced was not frivolous. [303]

CIVIL ACTION commenced in the Middlesex Division of the Probate and Family Court Department on May 30, 1990.

The case was heard by *Christina L. Harms*, J.

*Donald J. Bertrand* for George Baxter Upham.

*Alette E. Reed* for Jeanne Charlotte Louise Upham.

SMITH, J. George Baxter Upham (George) filed a complaint in the Probate and Family Court seeking a divorce from Jeanne Charlotte Louise Upham (Jeanne) in which he requested an equitable division of the marital assets pursuant to G. L. c. 208, § 34. Thereafter, Jeanne filed her answer in which she raised, as a bar to George's request for equitable distribution of the marital assets, a claim that the parties had executed an antenuptial agreement which settled the division of the marital assets in the event of a divorce. She also filed a cross complaint for divorce, alleging as grounds cruel and abusive treatment or an irretrievable breakdown of the marriage. She prayed, among other things, that the court enforce the antenuptial agreement and award her a suitable amount of alimony.

On June 4, 1991, Jeanne filed a "motion for bifurcation of issues and assignment for hearing on [the] issue of [the antenuptial] agreement as bar to equitable division of marital property." Her motion was allowed.

In January, 1992, the issue of the validity of the antenuptial agreement was tried before a Probate Court judge. After the trial concluded, the judge filed a memorandum of decision that contained her findings of fact and conclusions of law. The judge ruled that the antenuptial agreement was a "valid and binding agreement and controls the disposition of property between the parties in this divorce."

On March 6, 1992, a second hearing was held at which Jeanne waived her claim for alimony and the judge took evidence on the question whether there had been an irretrievable breakdown of the marriage. A judgment of divorce nisi was entered. The judgment recited that "[t]he parties have a valid and binding [a]ntenuptial [a]greement . . . [and] [t]hat agreement by its terms controls the division of property, and provides that each party shall retain that property held in his/her name solely and individually." Therefore, Jeanne was awarded all the assets in her name, and George those assets that were in his name.

On appeal, George claims that the judge did not employ the proper standard in determining that the antenuptial agreement should be enforced. He also contends that the judge committed error in (1) allowing in evidence testimony by Jeanne of alleged prior bad acts committed by him and (2) awarding the marital home and its contents to Jeanne under the antenuptial agreement.

We summarize the judge's findings of fact in regard to the validity of the antenuptial agreement and its enforcement. Our summary is supplemented by undisputed evidence disclosed in the record.

George and Jeanne were married in Sceaux, France, on April 30, 1964. At the time of their marriage, Jeanne was a French citizen (she remains so today) and George was an American citizen domiciled in France. George came from a family of substantial wealth; Jeanne from a family of lesser financial means. Prior to the marriage, George informed Jeanne that he wanted an antenuptial agreement, and Jeanne agreed to his request. On April 27, 1964, the parties executed an antenuptial agreement in France prepared by a French notary engaged by George.

By the terms of the antenuptial agreement, the parties declared their intention to be married under the "separate estate system," as provided in the French Civil Code. The agreement provided, among other things, that each spouse "*shall retain the ownership and possession of the real and personal estate that may belong to him or her at present or that he or she may own or possess in the future, whatever the basis of such ownership or possession may be*" (emphasis added). Thus, under the "separate estate system," in the event of divorce, individually held assets belong to the named individual spouse; jointly held assets belong to the parties jointly.[1] At the time of the execution of the agreement,

---

[1]The "separate estate system" differed from the "community regime system" available in France at the time. Under the latter system, property acquired during the marriage is common to both spouses and, upon divorce, is shared equally. That system also applies where there is no antenuptial agreement.

George owned (and Jeanne was aware that he owned) a home in Sceaux, France, and a manufacturing corporation called Azimut. He also owned stocks, was the beneficiary of a trust, and expected an inheritance. Jeanne owned a home in Planastel, France, which George had given to her as a gift.

In the late 1960's George purchased property in Roquefort, France, with his own funds. Title to the property was placed in the names of both George and Jeanne. In 1970, the parties relocated to the United States, and, in December, 1971, they bought a home in Newton for $100,000. Title to that property was taken jointly. In June, 1987, however, George transferred his interest in the Newton property to Jeanne.

In May, 1972, Jeanne formed a corporation in France with a Mr. Migot, who was a manager of the corporation owned by George. The corporation, in which Jeanne has a ninety-nine percent interest, purchased property in St. Gratien, north of Paris. At the time of the trial, the corporation was valued at $878,000, according to a stipulation entered into by the parties.

At the time of the trial, the following property was in George's name: checking accounts in banks in Boston and Paris; a joint interest in land in Roquefort, France; two apartments in France; and a 1989 Opel sedan. In addition, he received trust income of approximately $86,000 a year and, under the same trust, he has the right to reside free of charge in a family home in Claremont, New Hampshire. The property that was in Jeanne's name consisted of two checking accounts; the interest in the corporation that owned real estate in St. Gratien; a joint interest in land in Roquefort, France, which she owned with George; a debt from her brother representing proceeds of a law action; the residence in Newton where she lives; and the furnishings in that house.[2]

---

[2] The judge attributed the increase in Jeanne's assets during the course of the marriage to the fact that she proved to be a "fairly shrewd and successful investor and saver." In contrast, she found that George "proved

The judge held that the antenuptial agreement was valid when executed. On the issue of the enforcement of the antenuptial agreement, the judge ruled that, "neither party, if the [antenuptial] agreement . . . is applied, will find him/herself in such dire circumstances *as to shock the conscience of the court, or to otherwise require extraordinary court relief from an unconscionable result*" (emphasis added). The judge then concluded that "[i]t is not *unconscionable* to enforce the agreement just because [George's] assets are now of lesser value than [Jeanne's] or because her assets were derived in part from him or his family during the course of the marriage. This is the situation [the husband] bargained for when he asked for a[n antenuptial] agreement . . . . Enforcement of the [antenuptial] agreement will not leave [the husband] a pauper or dependent on welfare. *Knox* v. *Remick*, [371 Mass. 433 (1976)]" (emphasis added).

1. *George's challenge to the standard employed by the judge in determining to enforce the antenuptial agreement.* George does not challenge the judge's ruling that the antenuptial agreement was in accord with the laws of France and was valid at execution. Nor does he contest the judge's ruling that a valid antenuptial agreement between the parties will control the disposition of the property between the parties in a Massachusetts divorce. Rather, George claims the judge committed error in using a "conscionability" test to decide whether the antenuptial agreement should be enforced, rather than the "fair and reasonable" test enunciated in *Osborne* v. *Osborne*, 384 Mass. 591, 599 (1981). Jeanne argues that under the *Osborne* decision, the fair and reasonable test must be measured by a standard of "conscionability" and that, in any event, it is clear from the judge's findings that enforcement of the antenuptial agreement was fair and reasonable at the time of the entry of the judgment nisi.

In *Osborne* v. *Osborne*, *supra* at 598, the court upheld the validity of antenuptial agreements and ruled that such agreements may be specifically enforced. The court established

---

to be a spendthrift and a far less successful money manager [who] repeatedly depleted his assets throughout the marriage."

certain guidelines for the enforcement of such agreements, including the requirement that "the [antenuptial] agreement must be *fair and reasonable at the time of the entry of the judgment nisi*, and it may be modified by the courts in certain situations, for example, where it is determined that one spouse is or will become a public charge, or where a provision affecting the right of custody of a minor child is not in the best interests of the child." *Id.* at 599 (emphasis added).

There is some support for the judge's (and Jeanne's) position that the *Osborne* decision suggests that the test of an antenuptial agreement at the time of divorce is one of conscionability. Two distinguished commentators have stated:

> "What, then, is the appropriate fair and reasonable test at the time of the judgment nisi test announced in the *Osborne* decision, aside from that relating to fairness as of the time of execution? The *Osborne* decision suggests that the test is one of conscionability and public policy. If premarital agreements are to have any standing under which the parties can rely on them as an effective settlement of their financial interests, then it is clear that a trial judge cannot simply base the judgment nisi on the same factors set out in M.G.L.A. c. 208, Section 34. In other words, the bargain of the parties replaces the statute as the standard for determining financial awards, subject only to the enforcement of the agreement being conscionable.
>
> "The two examples cited in *Osborne* of countervailing factors which would cause the court to override the premarital agreement (contesting party in need of public assistance and welfare of minor children) both relate to matters of conscionability and public policy."

Kindregan & Inker, 1 Family Law and Practice § 383 (1990).

It is to be noted, however, that the court in *Osborne* never used the word "conscionable" or a similar word in its decision, as it could have and as courts in many other jurisdic-

tions have done.[3] In our view, a "conscionability" standard is not the same as a "fair and reasonable" standard. Although there may be substantial overlap between the standards, a standard of conscionability generally "requires a greater showing of inappropriateness." See 3 Lindey, Separation Agreements and Antenuptial Contracts § 90.07 (1993). Further, there is an indication in at least one decision after *Osborne* that the Supreme Judicial Court is aware of the two different standards. In *Brash* v. *Brash*, 407 Mass. 101, 105-106 (1990), the court held that the probate judge did not commit error in finding that an oral separation agreement under which the wife transferred all assets to the husband could not be considered "fair and reasonable and [was,] in fact, unconscionable"; thereby suggesting two different standards. In view of the judge's findings and our review of the entire record, however, even if the less stringent standard is employed, enforcement of the antenuptial agreement at the time of the divorce was not unfair and unreasonable to George.

2. *George's claim to a half interest in the Newton residence and its contents.* George claims that, despite the antenuptial agreement, he should still be considered a joint owner of the Newton home because the "contract" under which he consented to convey his interest in the Newton property to Jeanne as collateral for a $50,000 loan from her implied a covenant of good faith and fair dealing, which Jeanne violated when she refused to reconvey that interest to him after he repaid the loan.

There is nothing in the record that demonstrates that George specifically raised this "contract" theory at trial. Consequently, he may not raise it for the first time on appeal. See *Trustees of Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.*, 369 Mass. 562, 565 (1976); *Parrish* v.

---

[3]See, e.g., *Newman* v. *Newman*, 653 P.2d 728, 734-736 (Colo. 1982); *Gentry* v. *Gentry*, 798 S.W.2d 928, 936 (Ky. 1990); *McKee-Johnson* v. *Johnson*, 444 N.W. 2d 259, 266-268 (Minn. 1989); *MacFarlane* v. *Rich*, 132 N.H. 608, 614, 616-617 (1989); *Gross* v. *Gross*, 11 Ohio St. 3d 99, 109-110 (1984); *Bassler* v. *Bassler*, 156 Vt. 353, 361-362 (1991). Cf. *Martin* v. *Farber*, 68 Md. App. 137, 143-144 (1986).

*Parrish*, 30 Mass. App. Ct. 78, 82 n.5 (1991). In any event, there was evidence that George transferred the property to Jeanne as part of a negotiated decision.

George also claims that, under the antenuptial agreement, he was entitled to one-half of the contents of the Newton home. Again, George failed to raise this issue below, and he may not raise it now. See *Parrish* v. *Parrish, supra.* Even if he had properly raised the issue, however, there was uncontroverted evidence that the parties ceased to have a joint household in 1985 and that when George moved out of the Newton house in 1985 he removed many truck loads of his belongings, informing his wife that he was taking exactly what he wanted and that he did not "want anything more after that." The husband's claim that the agreement entitles him to half the contents of the Newton home cannot be sustained.

Finally, the judge found that "throughout the entire marriage, both parties had and kept their [antenuptial] agreement firmly in mind . . . . [O]n various occasions, title to various assets was taken in joint names or individual names on a considered, and sometimes even negotiated basis. Title was even on occasion transferred between the spouses, as part of careful and considered financial negotiations." The evidence clearly showed that the house and its contents were the subject of negotiations between the parties. The judge correctly ruled that the house and its contents belonged to Jeanne.

3. *George's claim that the judge improperly admitted evidence of his "bad acts."* George also claims that the judge committed error in allowing in evidence Jeanne's testimony that he "trashed" the Newton home and stole Jeanne's jewelry. He claims that the testimony in question described prior bad acts on his part and that its potential prejudice outweighed any relevance it might have.

It is clear from the record that the judge admitted the testimony as being relevant on the limited question whether George's conduct or words indicated that he knew or believed that he had no interest in the Newton property or that

Jeanne's jewelry belonged to him. Even if the evidence should not have been admitted, we fail to see how George was prejudiced. The judge did not refer to the "trashing episode" in her findings, and there is no indication that the judge relied on this evidence in reaching her decision that the antenuptial agreement controlled the division of the parties' property.

Jeanne urges that she be awarded double costs and attorney's fees because of the frivolous nature of George's appeal. The first issue raised by the husband on appeal regarding the standard to apply when determining whether antenuptial agreements should be enforced is not frivolous. This case does not warrant the imposition of double costs or attorney's fees.

*Judgments affirmed.*