Doerfer, J.
Plaintiffs seek to enforce the terms of an antenuptial agreement in this case. They are the children of the first marriage of the Decedent William J. Bickford. Defendant seeks a declaration that the agreement should not be enforced according to its terms for a number of grounds. She is the second wife of the Decedent and executed the antenuptial agreement in question with the Decedent.
There is no dispute that the agreement in question was executed nor any dispute as to the authenticity of the document itself which was received in evidence as Exhibit 6.[2] In paragraph 3, the defendant waives and relinquishes any and all rights which she might otherwise have as a surviving spouse under any statutes in the property and estate of her husband whether by distributive share in the event of intestacy, the right of waiver of or election to take against a will, or the right to dower or a widow’s allowance. In paragraph 5 it states, “Whether or not husband and wife are married at the time of the first of them to die and whether or not they are then living separate and apart (whether pursuant to a legal separation or otherwise) the survivor shall be entitled only to whatever interest the deceased party chooses to provide for the survivor in a will or trust executed on or after the date of this agreement. . .”[3]
Personal Background of the Parties and Circumstances Leading to the Antenuptial Agreement
Defendant was born in 1949 in Chelsea, Massachusetts, and graduated from the business program at her *379 high school. She later took courses at various community colleges and universities. For approximately twenty-five years, defendant worked part-time as a bookkeeper for Wasserman Associated and Sandell Development in Cambridge. In 1982, she also began working part-time for Mr. Bickford in his construction firm, Master Contractors, Inc (“Master Contractors”). Defendant asserts that she worked for Mr. Bickford as a receptionist rather than doing bookkeeping or accounting functions, but the weight of the evidence persuades the court that her responsibilities included bookkeeping including managing accounts and making disbursements and deposits to and from Mr. Bickford’s business and personal accounts. She also trained two other employees, Patricia Pepe and Ellen Hamilton, in those functions. Defendant became a clerk and director of Master Contractors in 1991.
Mr. Bickford was born in 1941 in Winthrop, Massachusetts, and grew up in East Boston. At age twelve, he began working part-time. Following his graduation from high school, Mr. Bickford worked as an apprentice plumber. He later became a licensed master plumber. During this time, Mr. Bickford also attended night corases at Northeastern University, obtaining a degree in engineering, and other courses for building contractors through Harvard Extension School.
Both defendant and Mr. Bickford had previous marriages. Defendant married Edward Porzio in 1969. They had two children during that marriage, but divorced in 1987. Defendant maintained physical custody of the children after the divorce. Mr. Bickford married Mary E. Bickford in 1964. Together they raised three children, who are the plaintiffs in this case. At some time during Mr. Bickford and Maty E.’s marriage, however, Mary E. developed a serious mental illness. This illness led Mr. Bickford to move out of their home in 1987 and subsequently to obtain a divorce in 1988. Nonetheless, Mr. Bickford maintained certain ties with Mary E. Mr. Bickford provided for Mary E.’s care by entering into a separation agreement (“the separation agreement”) under which he was required to pay her alimony for life and maintain life insurance for her benefit. The separation agreement also obligated Mr. Bickford to convey to Mary E. his interest in the family home located on Loring Road in Winthrop and a rental property located on Summit Avenue in Winthrop. Mr. Bickford held those properties in trust until his death, but never formally conveyed them to her according to the separation agreement.
Defendant and Mr. Bickford began dating in 1987. They became engaged in 1990 and married on February 22, 1992. At that time, Mr. Bickford was fifty years old, and defendant was forty-two. Both brought to the marriage strong commitments to their first families. In particular, because of Mary E.’s mental illness, Mr. Bickford had a substantial role in raising his children and a strong relationship with them.
Because they had such strong commitments to their prior families, defendant and Mr. Bickford agreed that they wanted to keep their prior estates separate. In accordance with these wishes, they agreed to sign an antenuptial agreement (“the antenuptial agreement”). Mr. Bickford retained Attorney Brian Bixby (“Attorney Bixby”) to draft the agreement at issue in this case. Defendant also received advice from a lawyer and signed the agreement despite her counsel’s recommendation to the contrary.
The antenuptial agreement incorporated detailed financial disclosure forms from both parties and meticulously explained each party’s rights in clear, numbered paragraphs. In relevant part, the antenuptial agreement provided that “(ejxcept as hereinafter provided, [the parties to the marriage] waive and relinquish any and all rights which (they) might have as a spouse or surviving spouse ...” The parties agreed that “(w)hether or not husband and wife are married at the time of the first of them to die . . ., the survivor shall be entitled to whatever interest the deceased party chooses to provide for the survivor in a will or trust executed on or after the date of this Agreement.” The antenuptial agreement also allowed the survivor to continue living in the marital home after one of them died and left the parties free to provide for each other with substantial gifts during their lives.
The Marriage and Mr. Bickford’s Death
Defendant and Mr. Bickford had been married for about three years when Mr. Bickford suffered a massive heart attack and died intestate on August 6, 1995. During their marriage, Mr. Bickford provided for defendant by establishing a $ 150,000 trust and a profit-sharing plan, and by taking out various annuities for her benefit. Defendant and Mr. Bickford also held some joint bank accounts. Defendant’s work as a bookkeeper for Mr. Bickford continued throughout their marriage, and she assumed the management of Master Contractors after he died.
Shortly after Mr. Bickford’s death, defendant petitioned the Probate Court to be appointed as the administrator of his estate. The court granted her petition on August 16, 1995. During her service as administratrix, defendant did not question the existence or validity of the antenuptial agreement, even acknowledging that it limited her rights as surviving spouse. Nonetheless, she consistently refused to give plaintiffs a copy of the antenuptial agreement. Defendant also did not deny the effect of the antenuptial agreement in correspondence with Attorney Bixby. As a result of that correspondence, Attorney Bixby proposed to plaintiffs that the antenuptial agreement be “waived” to achieve “significant estate tax savings.” Under this plan, defendant would take her share as surviving spouse, plaintiffs would take theirs as surviving issue of Mr. Bickford, and defendant would “gift" back to plaintiffs the remaining part of what they would have taken had the agreement been valid, with *380 out subtracting estate taxes. Plaintiffs then filed this declaratory judgment action.
Rescission of the Agreement
Defendant argues that the evidence shows that William rescinded the agreement during his lifetime and that therefore its validity need not even be examined. Defendant testified to instances during the marriage when Mr. Bickford started to draft a will, but never finished. The antenuptial specifically contemplates that either party could make a will and leave to the other such property as he or she chose. The conclusion the court draws from these occasions, though, is that either the decedent did not have the time, had not decided how to distribute his property, or simply decided not to draft a will at those times. These instances are not persuasive of an intent on the part of the decedent to abandon the antenuptial agreement, and it would be speculative to draw any further inference.
The court does not credit defendant’s testimony that Mr. Bickford told her that he had rescinded the agreement. Apart from the court’s general assessment of her credibility her testimony was difficult to reconcile with the fact that, throughout her term as administratrix, she never mentioned that either she or decedent had rescinded the agreement.
The Rosenberg Factors
The parties agree that the Supreme Judicial Court’s decision in Rosenberg v. Lipnick, 377 Mass. 666 (1979), outlines the factors to consider in judging the validity of antenuptial agreements, including
whether (1) it contains a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement; (2) the contesting party was fully informed of the other party’s worth prior to the agreement’s execution, or had, or should have had, independent knowledge of the other party’s worth; and (3) a waiver by the contesting party is set forth.
Id. at 672.
Having produced the written agreement, duly executed by the parties, the plaintiffs must also show that these three Rosenberg factors are satisfied. Delvecchio v. Delvecchio, 143 So.2d 17, 20-21 (Fla. 1962); Denison v. Dawes, 117 A. 314, 315 (Me. 1922); Guhl v. Guhl, 33 N.E.2d 185, 188 (Ill. 1941); In re Estate of Parish, 20 N.W.2d 32, 36 (Iowa 1945); Friedlander v. Friedlander, 494 P.2d 208, 213 (Wash. 1972); In re McClellan’s Estate, 75 A.2d 595, 597 (Pa. 1950).
The Rosenberg court further illuminated the nature of this burden in stating, “It is clear that the reasonableness of any monetary provision in an antenuptial contract cannot ultimately be judged in isolation. Rather, reference may appropriately be made to such factors as the parties’ respective worth, the parties’ respective ages, the parties’ respective intelligence, literacy, and business acumen, and prior family ties or commitments." Rosenberg, 377 Mass. 666, 672 n.3.
The court’s examination of the reasonableness of the contract will take account of those factors listed in Rosenberg. Contrary to the defendant’s assertion, however, that examination will not involve the factors listed in G.L.c. 208, §34, because that section sets out general factors to look at in cases of alimony and property division after divorce. Section 34 has nothing to do with property division in the postmortem context, where it is death, not divorce, that ends the marriage. Cases such as Kehoe v. Kehoe, 31 Mass.App.Ct. 958 (1992), and Grubert v. Grubert, 20 Mass.App.Ct. 811 (1995), that discuss the issue of alimony after a divorce are similarly inapposite.
Defendant argues that the antenuptial agreement should be scrutinized for fairness at the time of death as well as at the time of execution. No Massachusetts authority has yet been cited to the court, nor has the court found any, which would invoke the principle involved in a domestic relations context, that the agreement must be reasonable at the time of its application. See Osborne v. Osborne, 384 Mass. 591, 599 (1981) (stating, in the divorce context, that antenuptial contracts should be judged at the time of the judgment nisi); Upham v. Upham, 36 Mass.App.Ct. 299-300 (1994) (quoting Osborne).
Moreover, only one commentator could be found who has endorsed defendant’s position. See Paul G. Haskell, The Premarital Estate Contract and Social Policy, 57 N.C.L.Rev. 415, 419 (1979). In adopting that stance, though, the author acknowledged that no state had reached the same conclusion. Id. Given the lack of authority supporting it and the differing policy considerations surrounding the enforcement of ante-nuptial agreements in the death and divorce contexts, the court declines defendant’s invitation to examine the reasonableness of this antenuptial agreement at the time of Mr. Bickford’s death.
By requiring that antenuptial agreements be fair and reasonable at the time of execution, Rosenberg overruled Wellington v. Rugg, 243 Mass. 30, 35 (1922), which held that only proof of fraud could overturn an otherwise valid antenuptial agreement. Rosenberg, 377 Mass, at 672. Both Rosenberg and Wellington arose in the postmortem context. In addition, Rosenberg cited many postmortem cases from other jurisdictions, id. at 670, 672 n.3 & n.4, two of which explicitly reject defendant’s contention. See Rocker v. Rocker, 232 N.E.2d 445, 453 (Ohio 1967) (“it is clear that the situation must be viewed as of the time the contract was made, rather than as of the time of . . . death, nearly seven years later”); In re Estate of Kaufmann, 171 A.2d 48, 51 (Pa. 1961) (“in evaluating the reasonableness of the provision for the wife, such reasonableness must be determined as of the date of the agreement and not by hindsight”). Rosenberg’s reference to these cases is important because the *381 Supreme Judicial Court in Osborne, 384 Mass. at 595, carefully limited its holding to the divorce context.
Osborne decided that “an antenuptial contract settling the alimony or property rights of the parties upon divorce is not per se against public policy and may be specifically enforced.” Id. at 598. The secondary consideration that courts should retrospectively examine antenuptial agreements enforced at the time of divorce came in the course of a discussion analogizing those antenuptial agreements so enforced to separation agreements, which are usually made just before divorce and may, after incorporation into a court’s support order, require future modification in order to uphold the fairness of the original settlement. See Knox v. Remick, 371 Mass. 433, 435-38 (1976), cited by Osborne, 384 Mass. at 599; see also Charles P. Kindregan, Jr. & Monroe L. Inker, 2 Family Law §38.18, at 626 & §39.7, at 690 (2d ed. 1996 & Supp. 1999). The concerns about flexibility and continuing fairness expressed in the divorce context are not applicable when a party seeks to enforce an antenuptial agreement after one spouse’s death; rather, finality and certainty in the distribution of the decedent spouse’s property are of paramount importance. See Barbara Ann Kunzler, Law and the Housewife: Property, Divorce, and Death, 28 U.Fla.L.Rev. 1, 43-44 (1975).
As its holding indicates, the court in Osborne had to overcome the argument that the force of precedent at that time from other jurisdictions was that “ante-nuptial contract[s] made in contemplation of divorce [were] void as against public policy” because “(1) they [were] not compatible with and denigratefd] the status of marriage [and because] (2) they tend[ed] to facilitate divorce by providing inducements to end the marriage . . .” Osborne, 384 Mass. at 595-96. Before Rosenberg, on the other hand, the Supreme Judicial Court exercised no hesitation in upholding antenuptial agreements after a spouse’s death or in ordering specific performance, even when the surviving spouse had waived any other rights in the decedent’s estate. See, e.g., Price v. Price, 341 Mass. 390 (1960); Wellington, 243 Mass. 30 (1922); Eaton v. Eaton, 233 Mass. 351 (1919); Collins v. Collins, 212 Mass. 131 (1912); Paine v. Hollister, 139 Mass. 144 (1885); Freeland v. Freeland, 128 Mass. 509 (1880); Jenkins v. Holt, 109 Mass. 261 (1872); Tarbell v. Tarbell, 10 Allen 278 (1865); Sullings v. Richmond, 5 Allen 187 (1862); Miller v. Goodwin, 8 Gray 542 (1857); Gibson v. Gibson, 15 Tyng. 106 (1818); Hastings v. Dickinson, 7 Tyng. 153 (1810).
This line of cases demonstrates that, far from being historically disfavored, antenuptial agreements are actually “favored in the law” when applied at death, as one of many individual estate planning tools. Alexander Lindey & Louis I. Pailey, 3 Lindey on Separation Agreements and Antenuptial Agreements §110.69, at 71 (1999); see Michael K. Davis, Till Death Do Us Part: Antenuptial Agreements concerning Wills and Estates, 8 Prob.L.J. 301, 302 (1988); see also Brian Bix, Bargaining in the Shadow of Love: The Enforcement of Premarital Agreements and How We Think about Marriage, 40 Wm.&Mary L.Rev. 145, 153 (1998). But see Gayle S. Evans, Antenuptial Contracts Determining Property Rights Upon Death or Divorce, 47UMKCL.Rev. 31, 32 (pressing that this favored position conceals broad judicial discretion that freely strikes down these agreements based on antiquated notions of gender and fairness). Indeed, spouses may expect each other to prepare for death with wills or trusts. See Kunzler, 28 U.Fla.L.Rev., supra, at 41-42. Even our statutes provide a reasonable estate planning tool upon which those close to the decedent may rely: the intestacy system. See G.L.c. 190, §1 et. seq.
While the legislative command of that system is provision for the surviving spouse, by statute and subject to the requirements set forth in Rosenberg, parties may also agree on their future rights if their future marriage ends in one spouse’s death. See G.L.c. 209, §25. As the Supreme Judicial Court noted in Rosenberg, 377 Mass, at 673, “The right to make antenuptial agreements settling property rights in advance of marriage is a valuable personal right which courts should not regulate destructively. Neither should that right be looked upon with disfavor.” In this way, it cannot reasonably be contended that preparing for death quickens its onset or denigrates the institution of marriage.
Another consequence of the favored status of ante-nuptial agreements when they are applied at death is that over the last thirty years, only two states have held to the contrary position, that in antenuptial agreements, waivers of the rights held by the surviving spouse are void as against public policy, while the rest of the states have long accepted these waivers. See V. Woerner, Annotation, Waiver of Right to Widow’s Allowance by Antenuptial Agreement, 30 A.L.R.3d 858 (1970 & Supp. 1999). This stability relating to the enforcement of antenuptial agreements at death, among an overwhelming majority of states, is in sharp contrast to the trend in other states that prompted the Supreme Judicial Court in Osborne to reject the position that antenuptial agreements were unenforceable at divorce. See Osborne, 384 Mass. at 597-98.
The contention that the court must address in this case is less severe, for it only involves giving an antenuptial agreement a “second look” when it is enforced at death. Nevertheless, the case law in Massachusetts after Rosenberg deals with the application of antenuptial agreements in the context of divorce. See, e.g., Rosenblatt v. Kazlow-Rosenblatt, 39 Mass.App.Ct. 297 (1995); Rosenthal v. Campbell, 36 Mass.App.Ct. 965 (1994); Upham v. Upham, 36 Mass.App.Ct. 295 (1994); Boston Safe Deposit & Trust Co. v. Boynton, 15 Mass.App.Ct. 103 (1983); Osborne, supra.[4] For the court to undertake a retrospective *382 examination into the reasonableness of this antenuptial agreement would be to go beyond the factors delineated in Rosenberg. Such a change in policy would upset the expectations of other marital partners, and judicial reforms concerning antenuptial agreements and the probate system have, in the past, followed prior high court precedent. See Rosenberg, 377 Mass, at 667 (pondering the unsettling effect of applying that case’s holding retrospectively); see also Sullivan v. Burkin, 390 Mass. 864, 870-871 (1984) (similar considerations). Finally, change to the surviving spouse’s intestate share has always come from the Legislature.[5]
Did the agreement contain “a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement?”
In addressing this question, the court will examine “the parties respective worth, the parties’ respective ages, the parties’ respective intelligence, literacy, and business acumen, and prior family ties or commitments,” as well as other relevant circumstances. Rosenberg, 377 Mass, at 672.
The parties’ respective worth: Mr. Bickford had assets of almost $3.3 million, including cash, stocks, various real estate holdings, and other assets. The properties on Loring Road and Summit Avenue were the subject of a contractual obligation under the separation agreement and did not enhance the value of his estate. Defendant had assets worth just over $200,000, including a house, stocks, life insurance, cash, and other valuable personal items. She was also custodian, of two trusts established for her children which thus did not contribute to the value of her estate.
The parties listed assets on schedules to the ante-nuptial agreement. Those schedules provide evidence of the actual extent and value of their respective assets. None of the other evidence at trial persuades the court that the lists of their assets on the schedules were an incomplete or inaccurate accounting in any substantial fashion of their actual assets at the time of the execution of the antenuptial agreement.
The parties’ respective intelligence, literacy, and business acumen: From all the evidence at trial, the court concludes that both parties were intelligent persons who had completed a course of education. They both had experience in the business world. Mr. Bickford started out as a plumber and was skilled in the building trades. Defendant was trained in clerical and bookkeeping skills and had proficiency in running the office side of Mr. Bickford’s business. Both had raised children.
Mr. Bickford had gone further with his formal education and had gone further in his business achievements than had defendant. I do not find that Mr. Bickford was significantly more intelligent or accomplished than was defendant at the time of the execution of the antenuptial agreement.
Prior family ties or commitments: Both parties had been previously married. Both had children from their prior marriages who were still dependent on them at the time of the execution of the antenuptial agreement.
Mr. Bickford had an obligation to continue to support his former wife by maintaining two pieces of real estate for her benefit. She was mentally ill and required special services and care. He also had children for whose care, education and training he was responsible. Defendant was responsible for raising and educating her minor children as well, with such assistance as her former husband could provide.
Was the contesting party “fully informed of the other party’s worth prior to the agreement’s execution,” or did she have or should have had “independent knowledge of the other party’s worth”?
• As found above, the schedules attached to the antenuptial agreement were substantially accurate as to the nature and value of the parties respective assets. At trial, defendant focused on particular issues which the court resolves as follows.
The Loring Road and Summit Avenue properties: These properties were not listed in William’s schedule of assets. Although he held legal title to them, he was bound by his separation agreement with his first wife to hold them for her benefit or convey them to her. Thus, they were not assets of which he had any beneficial interest which needed to be disclosed to defendant.
Furthermore, Maty Porzio was aware of the existence of these assets. She regularly recorded rents received from them and paid bills out of those rent receipts related to those properties. She also knew that those properties were being used to support William’s first wife.
Life Insurance: In the estate tax return, there were listed certain life insurance policies which were not listed in Mr. Bickford’s schedule of assets in the antenuptial agreement. The evidence at trial did not present a persuasive picture as to the cash value of those policies at the time of the antenuptial agreement. Their face value is, of course, irrelevant. They had to be included in the taxable estate if William retained the power to change the beneficiary. On the record of the evidence at trial, the court cannot conclude that their omission was material.
Was “a waiver by the contesting party” set forth?
Defendant waived her right to the intestate share provided to the surviving spouse under G.L.c. 190, §1.[6] Before signing the antenuptial agreement the defendant submitted it to her attorney and sought his advice. Her attorney did not favor antenuptial agreements and advised her not to sign it, but she never *383 theless signed the antenuptial agreement. Her waiver was voluntary, made with full disclosure, and after and in spite of advice of counsel.
The Reasonableness of the Agreement
The court is convinced that the terms of the ante-nuptial agreement were fair to both defendant and Mr. Bickford at the time of execution. As with her complaint about rescission, defendant’s position on this point is inconsistent with her conduct while she was administratrix. Furthermore, the intent of the parties was clear and valid from the antenuptial agreement: both had prior marriages, children from those prior marriages, and sizeable estates that they wanted to remain separate. The antenuptial agreement left each of them free to provide for the other by wills, trusts, or lifetime gifts, and the evidence revealed that before his death, Mr. Bickford did so provide for defendant with substantial gifts, including annuities, a trust, and a profit sharing plan. The antenuptial agreement also allows defendant, as the surviving spouse, to remain living in the marital home after Mr. Bickford’s death. Moreover, defendant’s age and earning capacity at the time she and Mr. Bickford signed the antenuptial agreement present no circumstance that would lead this court to question the reasonableness of the ante-nuptial agreement.
ORDER
For the foregoing reasons, the court therefore enters a declaration for the plaintiff in Carol A. Bickford, Thomas Bickford, and Michael Bickford v. Mary A. (Porzio) Bickford, civ. No. 97-1569-B that the antenuptial agreement signed by William J. Bickford and Mary A. (Porzio) Bickford remains in force. Defendant shall abide by all of its terms.

 The court previously ruled on a motion in limine that there were no ambiguities in the terms of the document and thus that no evidence relating to prior or contemporaneous statements of the parties to the agreement would be received to vary its terms. Liacos, Handbook of Massachusetts Evidence, sec. 5.8.1 (6th ed. 1994) and cases cited. See Rulings on “Motion in Limine in Regard to Statements of Deceased Persons and the Parol Evidence Rule” on file.

 The defendant's argument that paragraph 10, which relates to the survival of the agreement until termination of the marriage, makes the agreement void at the time of death is specious.

 These cases also do not shed much light on what circumstances surrounding the signing of an antenuptial agreement might lead to a finding of “unreasonableness.”

 There are currently some suggestions to amend statutes dealing with the surviving spouse’s elective share to increase the minimum amount of the elected share to include additional categories of assets in the calculation of it in line with new federal estate tax regulations, and to give additional notice to the surviving spouse concerning their rights. See Patricia M. Annino, 23 Estate Planning §11.20, at 39 (2d ed. Supp. 1999), citing Susan N. Gary, Share and Share Alike? The U.P.C.’s Elective Share, 12-APR Prob & Prop. 18, 23 (1998).

 In relevant part, General Laws chapter 190, section. 1 states:
A surviving husband or wife shall, after payment of the debts of the deceased and the charges of his last sickness and funeral and of the settlement of his estate ... be entitled to the following share in his real and personal property not disposed of by will:
(2) If the deceased leaves issue, the survivor shall take one half of the personal and one half of the real property.