Curran, Dennis J., J.
This dispute stems from Attorney John J. Roche’s actions in administrating a trust for which he served as co-trustee. Attorney Roche drafted the 1997 trust documents and acted as a co-trustee, and the lone managing trustee, from 1999 until his death in 2006. Christina Ursul, a beneficiary of the trust, and Frank Yeomans, the current trustee, have brought this suit against Attorney Roche’s estate, and two law firms with which he was associated, alleging that Attorney Roche violated his fiduciary duty to the trust by improperly managing the trust assets, significantly depleting the trust funds. This case is currently before the Court on Taylor, Ganson & Perrin, LLP’s motion for summary judgment. The motion is joined, in part, by Attorney Roche’s wife, Judith Stackpole, in her capacity as Executrix of Attorney Roche’s Will. For the following reasons, the motion for summary judgment must be ALLOWED as to Taylor, Ganson, & Perrin, LLP.
BACKGROUND
The undisputed facts, as revealed by the summary judgment record, are as follows.
The George R. Ursul Revocable Trust was created by George R. Ursul on December 22, 1997. Attorney John Roche assisted George in preparing the Trust documents. The beneficiaries of the Trust were identified as George’s wife, Ruth Ursul, his daughter, Christina Ursul, and his brother, Robert Ursul. George Ursul died on March 13, 1999. Thereafter, Attorney Roche became a co-trustee of the Trust, a position he held until his death.
In 1999, at the time of his appointment as co-trustee, Attorney Roche worked as a sole practitioner at the law firm of John J. Roche & Associates. As co-trustee with Ruth Ursul, Attorney Roche handled all of the trust matters and assumed responsibility for making all of its investment decisions. Throughout his tenure as co-trustee, Attorney Roche did not provide any of the beneficiaries with accountings of the trust assets, nor did he discuss with them how its assets were being invested.
Attorney Roche joined the law firm of Taylor, Gan-son & Perrin, LLP on February 27, 2001, about two years after he began acting as co-trustee of the Trust. Upon joining the firm, Attorney Roche met with Ruth and Christina Ursul at the firm’s office and told them that he had transferred his law practice there and that he was a partner in the firm. Thereafter, Christina received some communications from Attorney Roche regarding the Trust on the law firm’s letterhead. She received no invoices from the firm. Attorney Roche used his own letterhead from John J. Roche & Associates to invoice his trust fees, not Taylor, Ganson & Perrin letterhead. However, these invoices were simply placed in the Trust files, and were not sent to the beneficiaries.
Unbeknownst to Christina, Attorney Roche was not an actual member of the firm’s partnership, rather, his role was solely that of “contract partner.” Attorney Roche’s contract with Taylor, Ganson & Perrin specified that he would “practice law on a part-time and exclusive basis on behalf of Taylor, Ganson & Perrin in the areas of estates and trusts, estate planning, taxation, probate law, and related or ancillary matters.” The Contract of Partnership also stated:
ii) Fiduciary Fees
JR [Attorney Roche] shall not share any Trustee fees received by him from the 70+ trust accounts presently located at Haldor, Fidelity, the Long, Wol-cott & Coolidge Office, and several banks. All Trustee fees will be kept separate from JR legal fees and shall be the sole property of JR, although such fees may be held in a standard “Agency Account” at TGP for the convenience of JR.
[[Image here]]
If JR cultivates any New Trust business which is integrated into TGP’s existing fiduciary services through Mellon Bank, JR shall receive_% of the Net Trustee’s fees . . .
These separate trust accounts included the Ursul Trust.
Beginning in 2002, Christina Ursul began to develop concerns regarding Attorney Roche’s management of the Trust. She discovered that he had closed out a TIAA-CREF account and in doing so, had increased the Trust’s tax liability for 2002. She was also concerned that Attorney Roche had advised her mother, Ruth Ursul, not to sell the family home in Brookline, Massachusetts.
Attorney Roche died in January of2006. Thereafter, Frank S. Yeomans was designated the new co-trustee. Mrs. Ruth Ursul died in September of 2006. No one has been designated to fill her role as co-trustee. The present suit was originally brought on January 25, *86 2007 in the Middlesex Probate Court, but after an inter-departmental transfer, is now before this Court.
DISCUSSION
Summary judgment is granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). For issues that the moving party does not have the burden of proof at trial, the absence of a triable issue may be shown by the submission of affirmative evidence that negates an essential element of the opposition’s case, or materials showing “that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts that would establish the existence of a genuine issue of material fact. Id. Parties may not rely on bare assertions and conclusions to create a dispute necessary to defeat summary judgment. Benson v. Massachusetts Gen. Hosp., 49 Mass.App.Ct. 530, 532 (2000), quoting Polaroid Corp. v. Rollins Envtl Servs., Inc., 416 Mass. 684, 696 (1993). The court views the evidence in the light most favorable to the non-moving party, but does not weigh the evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
A.Law of the Case
As a preliminary matter, this Court addresses the plaintiffs’ argument that this Court must deny the present motion because the prior Probate Court judge denied an earlier, similar motion for summary judgment. The plaintiffs argue that the earlier decision represents the “law of the case.” Successor trial judges are not bound by earlier determinations of law. Goulet v. Whitin Mach. Works, Inc., 399 Mass. 547, 553-54 (1987); Winchester Gables, Inc. v. Host Marriott Corp., 70 Mass.App.Ct. 585, 593 (2007). In this case, this Court is confronted with the additional dilemma that the Probate Court’s decision is silent as to any reason for denying the motion.
In any event, this case is presently before the Superior Court because the Probate Court lacked jurisdiction over the legal malpractice claims. See Feener v New England Tel & Tel. Co., 20 Mass.App.Ct. 166, 169 (1985) (finding Probate Court was without jurisdiction to hear negligence claim). This Court respectfully disagrees with the Probate Court that summary judgment must be denied and fashions its own decision applying the law to the undisputed facts.[5] Because jurisdiction over the summary judgment motion is now proper, this Court finds no obstacle to reviewing a similar motion anew.
B.Vicarious Liability of Taylor, Ganson & Perrin
The plaintiffs assert that the law firm of Taylor, Ganson & Perrin, a limited liability partnership, is vicariously liable for the negligent acts of Attorney Roche. The crux of the plaintiffs’ claim is that Attorney Roche imprudently invested the Trust funds and unwisely paid out large amounts from the fund, significantly decreasing its earning potential. They argue that an attorney-client relationship existed between the plaintiffs and Attorney Roche, and because he practiced law at Taylor, Ganson & Perrin, the firm can be held vicariously liable for his alleged misconduct.
Vicarious liability exists when any partner in a partnership commits a “negligent or wrongful act, error or omission ... in the performance of legal services by said entity . . .” S.J.C. Rule 3:06(3)(b), as amended, 423 Mass. 1302 (1996).[6] Before vicarious liability can be imposed on the law firm, a viable legal malpractice claim must exist against Attorney Roche as a partner in tíre firm. Sheinkopf v. Stone, 927 F.2d 1259, 1261 (1991).
“A tort plaintiff seeking damages for legal malpractice must establish that: (1) the attorney had a duty toward the plaintiff; (2) the attorney breached the duly by failing to exercise the proper degree of care; (3) the breach proximately caused the plaintiffs injuries.” Glenn v. Aiken, 409 Mass. 699, 708-09 (1991) (Liacos, C.J., concurring), citing Fishman v. Brooks, 396 Mass. 643, 646-47 (1986). “The duty of care owed by an attorney is based upon an attorney-client relationship. Malpractice can exist only in the context of an attorney-client relationship and this relationship is shown by an express contract or it may be implied in very limited circumstances.”[7] Greenfield-Spector v. Fox, 65 Mass.App.Ct. 1126, 2006 WL 845724 at *1 (Rule 1:28), citing DeVaux v. American Home Assur. Co., 387 Mass. 814, 817-19 (1983). If reasonable persons could differ as to whether an attorney-client relationship existed, then the issue must be resolved by the fact under. DeVaux, 387 Mass, at 818.
“An attorney-client relationship may be implied ‘when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney’s professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance ... In appropriate cases[,] the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it.’ ” DeVaux, 387 Mass, at 817-18, quoting Kurtenbach v. TeKippe, 260 N.W.2d 53, 56 (Iowa 1977).
“In a legal malpractice action it is not sufficient merely to prove an attorney-client relationship existed *87 with respect to some matters. It is necessary to establish that the relationship existed with respect to the act or omission upon which the malpractice claim is based.” Page v. Frazier, 388 Mass. 55, 62 n.10 (1983), quoting Kurtenbach, 260 N.W.2d at 56. Here, Attorney Roche’s trust management, including investment and disbursement decisions, forms the basis of the complaint.
Here, for a viable legal malpractice claim to exist, there must be an attorney-client relationship, either express or implied, between one of the plaintiffs and Attorney Roche and that relationship must exist in the context of the alleged improper investment and disbursement decisions.
With respect to Christina Ursul, there is no evidence in the summary judgment record that she ever affirmatively sought legal advice from Attorney Roche; nor is there any evidence that he ever gave her legal advice. All the interactions between the two were through Attorney Roche’s role as co-trustee of the Trust, not as an attorney for one of the beneficiaries. Indeed, had Attorney Roche represented Christina individually, he, potentially, would have created a conflict of interest because there were other beneficiaries (Ruth and Robert), over whom he had the power to disperse or withhold funds.
There is also no documentary evidence that Attorney Roche and Christina had an attorney-client relationship. No bills for legal services are in the record, nor are there any letters on Taylor, Ganson & Perrin letterhead that purport to show him giving her legal advice. Based on this record, the plaintiffs cannot expect to show at trial that an attorney-client relationship existed between Attorney Roche and Christina Ursul. See Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 522 (1989) (plaintiff must show that law firm represented his or her personal interests); Sheinkopf v. Stone, 927 F.2d at 1264-70 (applying Massachusetts law in upholding grant of summary judgment in favor of defendant law firm where no evidence showed attorney-client relationship despite meetings at law office, letters on letterhead and phone calls from legal secretary).
There is also no evidence in the record that the Trust itself was a Taylor, Ganson & Perrin client.[8] In his role as trustee, Attorney Roche was granted certain powers including, “[t]he Trustees may employ such attorneys, investment advisors, custodians, and other persons as they deem advisable . . . and may take any other action which they deem necessary or advisable . . .” (Emphasis added.) Based on this language, a trustee could bind the Trust to an outside attorney or investment advisor. Because Taylor, Ganson & Perrin had no relationship with the Trust before Attorney Roche joined the firm, any attorney-client relationship had to have been created after Attorney Roche joined the firm.
Under the terms of the Trust, the only individuals that could bind the Trust to an outside advisor, including an attorney in a law firm were the trustees, Attorney Roche and Ruth Ursul. It is undisputed that Ruth Ursul did not participate in any trust management decisions. Therefore, Attorney Roche would have needed to take affirmative steps to have the Trust become a Taylor, Ganson & Perrin client. He did not. Instead he took clear steps in the opposite direction to ensure that the Trust was not treated as a Taylor, Ganson & Perrin client.
Attorney Roche kept all Trust fees separate from his Taylor, Ganson & Perrin legal fees and billed for these Trust fees on his own (John J. Roche & Associates) letterhead. Conversely, if Taylor, Ganson & Perrin had invoiced the Trust for Attorney Roche’s work, those bills would not have been paid because he had already invoiced for that work as a member of John J. Roche & Associates. By separating the Trust from Taylor, Ganson & Perrin, he also maintained personal control over the investment decisions he made relating to the Trust.
There is no record evidence that Attorney Roche ever sought to employ the services of Taylor, Ganson & Perrin in advising or representing the Trust. The only connection between the law firm and the Trust are letters relating to trust management on Taylor, Ganson & Perrin letterhead and a meeting at the firm between Attorney Roche and Christina and Ruth Ursul. These items are simply not enough to create an attorney-client relationship between the law firm and the Trust. See Robertson, 404 Mass, at 523 (plaintiff who received many communications about transaction and thought law firm represented him but failed to communicate thought to anyone did not have attorney-client relationship with firm); see also deBruyne v. Clay, 1997 WL 471039 at *7-*8 (S.D.N.Y.) (distinguishing between actions undertaken as lawyer versus those in role as trustee).
Ultimately, there is no record evidence that the law firm of Taylor, Ganson & Perrin had an attorney-client relationship with either plaintiff. Because no attorney-client relationship existed between the plaintiffs and Taylor, Ganson & Perrin, no duly ran between the law firm and the plaintiffs. Without a duly, the plaintiffs’ legal malpractice claim against Taylor, Ganson & Per-rin must be dismissed.[9] See Symmons v. O’Keefe, 419 Mass. 288, 299-300 (1995) (affirming grant of summary judgment where no duty existed between attorney and trust beneficiaries).
C. Standard of Review Applicable to the Trustee’s Personal Liability
‘The interpretation of a written trust is a matter of law to be resolved by the court... A trust should be construed ‘to give effect to the intention of the settlor as ascertained from the language of the whole instrument considered in the light of the attendant circumstances.’ ” Gershaw v. Gershfield, 52 Mass.App.Ct. 81, *88 86-87 (2001), quoting Schroeder v. Danielson, 37 Mass.App.Ct. 450, 453 (1994). See also Walker v. Walker, 433 Mass 581, 587 (2001).[10]
The title of subsection D of the Eleventh paragraph of the Trust reads: “D. Finality of Trustees’ Judgment; Trustees’ Liability; Trustees’ Bond; Restriction on Discretionary Powers.’’ The section contains five sentences. The first sentence of subsection D addresses the limits of the trustees’ judgment. The second sentence reads: “No Trustee under this instrument shall be personally liable for any good faith action or omission or for the consequences of any investment made in good faith.” Continuing, the third sentence states that no trustee must post a bond. The fourth sentence creates a restriction on discretionary powers where the trustee is also a beneficiary. The final sentence then lifts that restriction as to the Grantor. Reading the entirety of subsection D in harmony, this Court holds as a matter of law that the second sentence of the section is intended to outline the standard to be applied when reviewing a trustee’s potential liability.
Many other trust instruments include exculpatory clauses like the one contained in the Trust. While these clauses are not favored and are strictly construed, such “provisions inserted in the trust instrument without any overreaching or abuse by the trustee of any fiduciary or confidential relationship to the settlor are generally held effective except as to breaches of trust committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary.” Marsmanv. Nasca, 30 Mass.App.Ct. 789, 799-800 (1991) (internal citations omitted) (trial judge’s decision to hold similar exculpatory clause ineffective was error and trial court instructed to apply standard outlined in clause). Accordingly, this Court will employ the good faith standard imposed by the Trust documents. See Boston Safe Deposit & Trust Co. v. Goodwin, 59 Mass.App.Ct. 270, 272 (2003) (“determinative factor in construing the provisions of a testamentary document is the creator’s intention”); Gray v. Gray, 2008 WL 6572166 (Mass.Super.Ct., Gershengom, J.) (finding exculpatory clause insulated trustee from liability where imprudent investment decisions were alleged), affd, Gray v. Gray, 76 Mass.App.Ct. 1131 (2010).
In applying this standard, the Court must “judge the acts of the trustee from the position which it occupied when it acted, and not by hindsight from our present vantage point.” O’Brien v. Dwight, 363 Mass. 256, 295 (1973). This means that the plaintiffs must prove that at the time the investment decisions were made and the disbursements given, Attorney Roche was acting in bad faith or with reckless indifference to the interests of the beneficiaries. The summary judgment record before the Court does not contain any evidence of bad faith or reckless behavior.
Despite this determination, it is the Court’s understanding that the accountings from the time period when Attorney Roche was trustee have not been finalized. In fairness to the plaintiffs, then, the Court will not rule on this aspect of the motion until all of the accountings have been finalized and the financial record is complete.
D. Statute of Limitations
Tort actions, including those for breach of a fiduciary duty, must be commenced within three years after the cause of action accrues. G.L.c. 260, §2A. In cases where a fiduciary duty exists, the statute will not begin to run until a beneficiary acquires actual knowledge that the trustee has repudiated the trust. See Doe v. Harbor Schs., Inc., 446 Mass. 245, 248 (2006). Repudiation of the trust can occur by express words or by the trustee taking actions inconsistent with his responsibilities as trustee. Lattuca v. Robsham, 442 Mass. 205, 213 (2004). Constructive knowledge is not sufficient to start the statute of limitations. Id.
At her deposition, Christina Ursul testified that in 2002 she had “concerns” about the increased tax liability created by Attorney Roche’s decision to have the TIAA-CREF pension benefits paid to the Trust. She also mentioned a conversation between herself and her uncle during which they discussed replacing Attorney Roche with another trustee. These misgivings alone are insufficient to constitute actual knowledge that Attorney Roche had repudiated the trust.
A legal malpractice claim accrues when “a client or former client knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer’s conduct.” Williams v. Ely, 423 Mass. 467, 473 (1996). This represents a more lenient standard than the “actual knowledge” requirement for violations of fiduciary duties. “Although the client has the burden of proving that he or she should not reasonably have known of the harm, once the client offers evidence that he or she did not know of the harm, the lawyer has the burden of coming forward with evidence that warrants a finding that the client reasonably should have known of the harm.” Id. at 475. The facts in the record are not sufficient to establish that when Christina Ursul, a social worker, found out that the Trust’s tax liability might increase, she should have known that a claim for malpractice existed. See id. at 473-75 (declining statute of limitations defense in legal malpractice case involving tax liability even when plaintiff had sophisticated financial background, statute did not run until plaintiff clearly knew of the harm).
ORDER
For these reasons, Taylor, Ganson & Perrin’s renewed motion for summary judgment is ALLOWED. Judith Stackpole’s joint renewed motion for summary judgment is held under advisement pending the completion of the required accountings. Ms. Stackpole shall complete the final accountings within sixty (60) *89 days of this Order and shall so promptly notify this Court.

This Court has also been presented with different, additional summary judgment evidence including the deposition of Charles O’Connell, Taylor, Ganson & Perrin’s managing partner.

While much is made of the partnership issue in the parties’ papers, this Court will, for purposes of this motion, accept the plaintiffs’ position that Attorney Roche and the law firm represented that he was a full partner at the firm. See Andrews v. Elwell, 367 F.Sup.2d 35, 37-44 (2005) (extensive discussion of Massachusetts law on law firm partnerships).

Attorney Roche’s initial attorney-client relationship was with George Ursul, for whom he drafted the Trust documents and who relied on him for legal advice. Upon George Ursul’s death, Attorney Roche became a trustee by operation of the Trust, not by a search by the beneficiaries or other trustees.

As successor trustee, Frank Yeomans has a duty to bring any claim for breach of duty against a former trustee. See O’Connor v. Redstone, 452 Mass. 537, 552 (2008) (successor trustee has responsibility of taking reasonable steps to uncover and redress any breach of duty committed by predecessor fiduciary).

The claim against John J. Roche & Associates cannot be dismissed on the same grounds because the firm invoiced the Trust for trust management fees, thereby creating an issue of material fact as to whether there was an attorney-client relationship between that firm and the Trust. See Fitzsimmons v. Soutter, 1994 WL 879599 at *4-*5, (Mass.Super.Ct, Sosman, J.) [12 Mass. L. Rptr. 380] (a genuine issue of material fact exists as to whether investment services were legal services where firm billed for investment-related work).

Taylor, Ganson & Perrin’s motion to strike the proposed testimony of Jarrod Wilcox and Gail Sullivan must be allowed because these experts attempt to interpret the Trust documents and apply a different standard than that found by the Court. The Court must interpret the Trust documents and expert testimony on questions of law is unnecessary. Similarly, expert testimony on the issue of damages is irrelevant at this procedural stage.