**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2006**

In re the Marriage of:

Michelle Beth Kremer, petitioner,
Respondent,

vs.

Robbie Michael Kremer,
Appellant.

**Filed January 9, 2017
Affirmed in part, reversed in part, and remanded
Smith, Tracy M., Judge
Concurring in part, dissenting in part, Hooten, Judge**

Nobles County District Court
File No. 53-FA-10-425

William J. Wetering, Steven R. Forrest, Hedeen, Hughes & Wetering, Worthington, Minnesota (for respondent)

Kay Nord Hunt, Mark A. Johannsen, Lommen Abdo, P.A., Minneapolis, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Hooten, Judge; and Smith, Tracy M., Judge.

# S Y L L A B U S

The procedural fairness of an antenuptial agreement that covers or includes marital property is assessed under the common law, using the multifactor test outlined in *In re Estate of Kinney*, 733 N.W.2d 118 (Minn. 2007).

# OPINION

**SMITH, TRACY M.**, Judge

In this family-law case, appellant husband challenges the district court's order declaring invalid the antenuptial agreement he executed with respondent wife. Husband also challenges the district court's subsequent order awarding wife (1) $750,000 as her share of marital property, (2) temporary rehabilitative and permanent spousal maintenance, and (3) need-based attorney fees. We conclude that the district court did not err in determining that the antenuptial agreement is invalid and did not abuse its discretion in awarding marital property, temporary rehabilitative spousal maintenance, and attorney fees to wife. However, we conclude that the district court abused its discretion in its award of permanent spousal maintenance. We therefore affirm in part, reverse in part, and remand.

## FACTS

Appellant Robbie Kremer and respondent Michelle Kremer began living together in 1997 and, in August 2000, agreed to get married. While they were living together before their marriage, husband informed wife that he would not marry her without an antenuptial agreement, but they did not discuss any terms. When they agreed to marry, husband was the owner of a farming operation with equity of $643,756. Wife worked at a gas station and later on husband's farm. This was husband's first marriage, and wife was previously married and divorced. When the parties married, wife had children.

The parties planned a March 6, 2001 destination wedding in the Cayman Islands, together with family and friends. The parties planned to travel from their home in Nobles County to the Twin Cities on March 1, in anticipation of their March 2 flights. Beginning

2

in late January or February, unbeknownst to wife, husband began meeting with his lawyer to draft an antenuptial agreement. Husband had a minimum of six contacts with his attorney to create the document. On February 26, husband met with his attorney and signed the agreement; sometime later that day, husband gave the signed agreement to wife and told her to talk to an attorney. Husband made clear that there would be no wedding if she did not sign the agreement. By this time, family and friends had paid for their lodging and airfare to the Cayman Islands, and some of them had started their travels.

Wife attempted but failed to secure an appointment with her attorney from her previous divorce, but she was able to consult with a different attorney on February 28. The attorney reviewed the agreement with wife, and wife signed the agreement at that meeting and returned it to husband the same day. The agreement foreclosed any claims to spousal maintenance and provided that marital property would be divided "in proportion to the actual monetary consideration provided by each [party]."

The next day, the parties traveled to the Cayman Islands, and they were married on March 6. After the wedding, wife worked less on the farm than she had prior to getting married. After the parties' child was born in 2008, wife's time spent working on the farm further decreased, but she still contributed to the farm operation. Wife's contributions to the farm included driving the combine, bringing seed out to the field, making meals for farm workers, and mowing the lawn. Wife also maintained the house, purchased groceries, and cared for the children. While the parties were married, wife at times worked part-time outside the home.

3

By December 2009, husband's equity interest in the farming operation had increased by $1,896,516. That year, husband signed wife up for a federal farm program, and, although he testified that wife was not contributing to the farm, husband represented to the government that they were in a 70/30 joint venture.

Wife petitioned for marriage dissolution in April 2010. During the dissolution action, wife moved to set aside the antenuptial agreement on the grounds that it "was a product of duress and coercion" and that she did not have "sufficient legal advice" to fully understand the agreement. Wife further claimed that the agreement was unfair at inception and that it was unfair at enforcement due to wife's change in financial circumstances. The district court bifurcated the dissolution action, separating the property issues from the other issues for later resolution. After a hearing in 2011, the district court concluded that the agreement was invalid.

The parties' marriage was dissolved on January 10, 2012, and they agreed to that date as the valuation date of assets. Husband claims that the dissolution affected his ability to obtain financing and that he had to downsize his farming operation in 2012. Husband farms land that he rents; he does not own tillable land. Husband's father also farms. From 2009 to 2011, husband farmed approximately 2,500 acres, and his father farmed approximately 500 acres. During 2012, husband downsized his farming operation to 172 acres. Husband also sold $1.5 million of stored grain, paid off a debt, and purchased new equipment, which he used to custom farm his father's land for no pay.[1] That year,

---

[1] Expert testimony valued husband's work for his father at $354,558 to $430,218. The expert also testified that 2012 was the most successful year in grain farming in a lifetime.

4

husband's father farmed the balance of the land previously farmed by husband in the operation, totaling about 3,000 acres.

After a two-day trial on the property issues in December 2014 and January 2015, the district court filed an order requiring husband to pay both temporary rehabilitative and permanent spousal maintenance. In addition, the district court found husband's claim that he was forced to reduce his farm operation not credible and concluded that husband dissipated $1.5 million in assets during the dissolution proceeding in violation of Minn. Stat. § 518.58, subd. 1a (2016). The district court ordered husband to pay $750,000 as an equitable distribution of marital property. The district court also ordered husband to pay $168,000 toward wife's need-based attorney fees. Husband appeals.

## ISSUES

I.  Did the district court err in concluding that the parties' antenuptial agreement is invalid?

II.  Did the district court abuse its discretion in its division of the marital estate?

III.  Did the district court abuse its discretion in awarding spousal maintenance?

IV.  Did the district court abuse its discretion in awarding respondent need-based attorney fees?

## ANALYSIS

**I.  The district court did not err in invalidating the antenuptial agreement.**

Wife contested the validity of the parties' antenuptial agreement. The agreement addresses the disposition of nonmarital and marital property, as well as spousal maintenance, upon dissolution of the marriage. The district court awarded husband his nonmarital property, and wife does not challenge that decision. However, the district court

5

concluded that the antenuptial agreement was invalid and awarded wife marital property and spousal maintenance without regard to the agreement. Husband argues that the district court erred in invalidating the agreement.

"Statutory construction is a question of law, which this court reviews de novo." *In re Estate of Rutt*, 824 N.W.2d 641, 645 (Minn. App. 2012) (quotation omitted), *review denied* (Minn. Jan. 29, 2013). Where the relevant facts are undisputed, the application of a statute to those facts is a question of law we undertake de novo. *Id.* Where facts are in dispute, appellate courts will defer to the findings of the district court, unless those findings are clearly erroneous. *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013). We defer to the district court's credibility determinations. *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988).

**A. Standard of law**

The critical initial issue is identifying the appropriate legal standard for evaluating the validity of antenuptial agreements that, like the one at issue here, are entered into after the effective date of Minn. Stat. § 519.11 (2016), and that address marital property. Section 519.11 states that it "shall apply to all antenuptial contracts and settlements executed on or after August 1, 1979." Minn. Stat. § 519.11, subd. 6. Here, it is undisputed that the parties' antenuptial agreement was executed after August 1, 1979. Therefore, the statute applies to the parties' agreement.

Under subdivision 1 of the statute,

> [a] man and woman of legal age may enter into an antenuptial contract or settlement prior to solemnization of marriage which shall be valid and enforceable if (a) there is a full and fair

6

disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice. An antenuptial contract or settlement made in conformity with this section may determine what rights each party has in the nonmarital property, defined in section 518.003, subdivision 3b, upon dissolution of marriage, legal separation or after its termination by death and may bar each other of all rights in the respective estates not so secured to them by their agreement. This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section.

The first sentence of this subdivision states that an antenuptial agreement "shall be valid" if the parties made full disclosure and had access to counsel. *Id.*, subd. 1. This sentence does not otherwise limit itself. Generally, "'[s]hall' is mandatory." Minn. Stat. § 645.44, subd. 16 (2016). Therefore, if this sentence is read in isolation, it could be argued that it applies to all antenuptial agreements entered into after the effective date of the statute. But we conclude that the Minnesota Supreme Court's decisions in *McKee-Johnson v. Johnson*, 444 N.W.2d 259 (Minn. 1989), and *In re Estate of Kinney*, 733 N.W.2d at 118, direct otherwise.

*McKee-Johnson* addressed an antenuptial agreement executed after the effective date of Minn. Stat. § 519.11. 444 N.W.2d at 262. That agreement covered both marital and nonmarital property, but it was challenged only with respect to marital property. *Id.* at 261. The district court ruled that section 519.11 rendered the portion of the agreement addressing marital property void and unenforceable as a matter of law. *Id.* at 262. This court affirmed the district court's ruling, concluding that section 519.11 excluded, as a

7

matter of law, marital-property rights from the scope of rights able to be addressed by an antenuptial agreement. *McKee-Johnson v. Johnson*, 429 N.W.2d 689, 692-94 (Minn. App. 1988), *rev'd* 444 N.W.2d at 261. The supreme court disagreed, concluding that Minn. Stat. § 519.11 does not preclude antenuptial agreements from addressing marital property. *McKee-Johnson*, 444 N.W.2d at 264-65.

Critical to the supreme court's ruling in *McKee-Johnson* was the court's interpretation of the third sentence of subdivision 1: "This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section." *Id.* at 263 (quoting Minn. Stat. § 519.11, subd. 1 (1988)). The supreme court reasoned that this sentence was ambiguous, and resorted to the legislative history of section 519.11 to discern the meaning of the sentence. *Id.* After reviewing the legislative evolution of what became Minn. Stat. § 519.11, the supreme court stated, "[t]he thrust of the bill was directed to codification of procedural fairness requirements in the execution of a valid antenuptial contract and, with respect to nonmarital property, to make it more difficult to subsequently challenge the validity of an antenuptial agreement covering nonmarital property." *Id.* at 264. The court explained that the legislative history showed no hostility to antenuptial contracts addressing marital property. *Id.* at 265. "To the contrary," the court wrote, "the statute recognizes the validity of such a contract so long as 'it would be valid and enforceable without regard to this section.'" *Id.* at 264-65. "Therefore," the supreme court concluded, "to determine whether the

8

provisions of this contract relating to 'after acquired' [*i.e.*, marital] property are valid and enforceable, we must look to our common law for guidance." *Id.* at 265. *McKee-Johnson* thus decided that if an antenuptial agreement addresses marital property, its validity is assessed under the common-law standard rather than the statutory standard.[2]

*McKee-Johnson* then reviewed Minnesota antenuptial-agreement cases decided under common law and stated that those cases show that antenuptial agreements, "if fairly arrived at, following full disclosure of financial condition, and with opportunity to consult independently with counsel, have been favored in the common law of Minnesota—even

---

[2] The dissent argues that the third sentence of Minn. Stat. § 519.11, subd. 1, operates as a savings clause to validate agreements that would otherwise be invalid under the statute. According to the dissent, the savings clause thus operates in one direction, toward validity: Agreements that satisfy statutory procedural fairness would not be invalid even though they fail common-law procedural fairness, while agreements that fail statutory procedural fairness would not be invalid as long as they satisfy common-law procedural fairness. We do not believe that this interpretation squares with *McKee-Johnson*, which, after noting that Minn. Stat. § 519.11 did not preclude antenuptial agreements from addressing marital property, stated that "[t]herefore" the court "must look to our common law for guidance" regarding whether the antenuptial agreement was "valid and enforceable" regarding marital property. *McKee-Johnson*, 444 N.W.2d at 265. Alternatively stated: It was because the *McKee-Johnson* antenuptial agreement addressed marital property that *McKee-Johnson* invoked the common law.

The dissent also argues that the "plain language" of the first sentence of Minn. Stat. § 519.11, subd. 1, requires application of statutory procedural fairness to all antenuptial agreements executed after the statute's effective date, and to do otherwise is to rewrite the sentence or render it meaningless. But that sentence states that "an antenuptial [agreement] . . . *shall* be valid and enforceable" if there was full disclosure and access to counsel. Minn. Stat. § 519.11, subd. 1 (emphasis added). Clearly that "plain language" does not hold, because *McKee-Johnson* requires evaluation of substantive fairness before an antenuptial agreement addressing marital property is determined to be valid and enforceable. If the first sentence of subdivision 1 applies to all antenuptial agreements, and if that sentence is satisfied, why a court must also address the substantive fairness of an agreement that is already valid and enforceable becomes unclear.

9

though marital property was included within their scope." *Id.* The supreme court went on to explain that the common-law standard for assessing the validity of antenuptial agreements includes separate inquiries addressing the agreement's procedural and substantive fairness. *Id. McKee-Johnson* also stated that (a) "Minn. Stat. § 519.11 did not alter common law rules of procedural or substantive fairness applicable to provisions relating to the allocation of marital property;" and (b) "[t]he procedural review focuses on determining whether at the inception the agreement was fairly procured, and, under the common law, relevant factors to be considered are substantially identical to those which the legislature codified in Minn. Stat. § 519.11, subd. 1 (1988)." *Id.*

Thus, *McKee-Johnson* ruled that the two-part disclosure-and-access-to-counsel standard in the first sentence of Minn. Stat. § 519.11, subd. 1, is "substantially identical" to the common-law standard for procedural fairness. Apparently as a result of what *McKee-Johnson* identified as the symmetrical requirements of the statute and the common law for the procedural fairness of an antenuptial agreement, *McKee-Johnson* then stated that "[u]nder the common law, and, as well, the statute," procedural fairness requires full financial disclosure and the opportunity to consult counsel. *Id.* at 265-66. Critical for purposes of this appeal is the idea that, according to *McKee-Johnson*, both the statutory and common-law standards for assessing the validity of an antenuptial agreement require that the parties to that agreement have had the opportunity to consult independent counsel.[3]

_____

[3] Portions of *McKee-Johnson* arguably could be read to suggest that its assessment of the procedural fairness of the antenuptial agreement was somehow based on the statute. *See, e.g.*, 444 N.W.2d at 265 (stating that "[u]nder the common law, and, as well, the statute,

10

In 2007, the supreme court decided *Kinney*. Because *Kinney* involved an antenuptial agreement entered into in 1969, the agreement was not governed by Minn. Stat. § 591.11. 733 N.W.2d at 122. This court's unpublished decision ruled the agreement in *Kinney* invalid under the common law because the wife had not had the opportunity to consult independent counsel. *In re Estate of Kinney*, No. A05-1794, 2006 WL 1806386, at *3 (Minn. App. July 3, 2006), *rev'd* 733 N.W.2d at 120. The supreme court disagreed, concluding that "the opportunity to consult with independent counsel is a relevant factor in the analysis," but it is not "a *requirement* for a valid antenuptial agreement under common law." *Kinney*, 733 N.W.2d at 124.

The supreme court laid out a multifactor test for assessing whether an antenuptial agreement was equitably and fairly made:

> (1) whether there was fair and full disclosure of the parties' assets; (2) whether the agreement was supported by adequate consideration; (3) whether both parties had knowledge of the material particulars of the agreement and of how those provisions impacted the parties' rights in the absence of the agreement; and (4) whether the agreement was procured by an abuse of fiduciary relations, undue influence, or duress.

*Id.* Further, *Kinney* states both that (a) "[w]e hold that the opportunity to consult with independent counsel is not a requirement, but is one of several relevant factors that courts may consider when determining whether an antenuptial agreement is fair and equitable and

---

one standard relative to the procedural fairness requirement is met whenever the proponent has established . . ."). We believe, however, that a fair reading of *McKee-Johnson* shows that these references to the statute arise from what *McKee-Johnson* identified as the symmetrical requirements of the statute and the common law, not any dependence on the statute.

therefore enforceable under common law;" and (b) "[t]o the extent that *McKee-Johnson . . .* could be read to indicate otherwise, [it is] overruled on that issue." *Id*. at 125-26. Thus, after *Kinney*, if the validity of an antenuptial agreement is assessed under the common law, that agreement may be valid even if a party lacked the opportunity to consult independent counsel.

Integrating these two supreme court decisions, we conclude that the district court, in accordance with *McKee-Johnson*, should have evaluated the antenuptial agreement under the common-law standards of procedural and substantive fairness and that *Kinney* articulates the common-law standard of procedural fairness.[4]

---

[4] The dissent argues that our reading of *McKee-Johnson* creates a potential for confusion. The dissent asserts that, under our reading, a single antenuptial agreement addressing both marital and nonmarital property could be subject, simultaneously, to multiple (different) tests for determining its validity, thereby creating the possibility of inconsistent results under those different tests. To be clear, we conclude that the validity of an antenuptial agreement addressing marital property is determined *solely* by the common-law procedural-and-substantive-fairness test, whether or not that agreement also addresses nonmarital property.

We believe that this conclusion is compelled by the third sentence of subdivision 1 of the statute, as that sentence was interpreted by the supreme court in *McKee Johnson*: That sentence refers to antenuptial agreements that "cover[] or include[] marital property." Minn. Stat. § 519.11, subd. 1. After finding the sentence ambiguous, the supreme court interpreted the sentence to require application of the common law to determine the validity of such agreements. And, after identifying the common-law standard for procedural fairness, which the statute "did not alter," the supreme court ruled that the agreement in *McKee-Johnson* was procedurally fair, and remanded the case to the district court for "review of the substantive fairness of the *agreement*" at inception and, if necessary, its fairness at enforcement. *McKee-Johnson*, 444 N.W.2d at 265, 267 (emphasis added). Based on *McKee-Johnson*'s construction of the statute, there is only *one* test that applies to antenuptial agreements addressing marital property, and that one test is the common-law procedural-and-substantive-fairness test. In contrast, under the dissent's analysis, if an agreement including marital property fails the statutory test for procedural fairness, that

**B. Application to this case**

The district court's order analyzed the antenuptial agreement for procedural and substantive fairness. Regarding procedural fairness, the district court equated procedural fairness with satisfaction of the statutory provisions of full and fair disclosure and opportunity to consult with legal counsel, and found the agreement procedurally defective because wife did not have a meaningful opportunity to consult counsel of her choice.

To the extent that the district court relied on the statute for the standard for evaluating procedural fairness, the district court erred. As noted above, *Kinney* identifies the common-law analysis as:

> (1) whether there was fair and full disclosure of the parties' assets; (2) whether the agreement was supported by adequate consideration; (3) whether both parties had knowledge of the material particulars of the agreement and of how those provisions impacted the parties' rights in the absence of the agreement; and (4) whether the agreement was procured by an abuse of fiduciary relations, undue influence, or duress.

*Id.* at 124. The opportunity to consult independent counsel is a relevant factor in making that analysis. *Id.* at 125.

___

same agreement must then be analyzed under the common-law procedural fairness test, with the possible result that the same agreement could be procedurally unfair under the statute but procedurally fair under the common law. We believe this reading of Minn. Stat. § 519.11 introduces more, not less, confusion and uncertainty into the process of assessing the validity of antenuptial agreements. We also believe it unlikely that this two-step assessment of procedural fairness was contemplated by *McKee-Johnson*. According to *McKee-Johnson*, the statutory procedural-fairness test and the common-law procedural-fairness test were identical; there would have been no reason to apply the same test twice.

13

The parties agree that wife bears the burden of proving that the agreement is invalid.[5] The parties do not dispute that there was full and fair disclosure of assets. The district court's findings do not touch on the adequacy of consideration for the agreement. With respect to the parties' knowledge of the particulars of the agreement and how they affected their rights, the district court found that wife consulted counsel but did not make findings regarding whether wife had knowledge of provisions of the agreement and how they impacted her rights. The record shows, however, that wife acknowledged in testimony that her attorney explained her rights as a married person and the effect of the agreement in the event of divorce, and wife affirmed that her attorney made no suggestions or recommendations regarding the agreement. Finally, although the district court analyzed the agreement under a different framework, it in essence found that the agreement was procured by duress and, with respect to consultation with counsel, that wife's opportunity was not meaningful because of the short timeframe and because it was not the counsel of her choice.

---

[5] *Kinney* states:

> [U]nder common law the burden of proof is on the proponent of an antenuptial agreement when (1) the parties stand in a confidential relationship and (2) the agreement is not supported by adequate consideration. But when . . . the parties stand in a confidential relationship and the district court finds that the antenuptial agreement is supported by adequate consideration, we conclude that under common law the burden is on the party challenging the agreement.

733 N.W.2d at 127 (footnote omitted). *Kinney* also notes that "[a] confidential or fiduciary relationship between the parties to an antenuptial agreement is usually presumed." *Id*. at 124 n.7.

14

The district court based its determination that wife did not have a meaningful opportunity to consult independent counsel on a number of facts. First, husband gave wife the agreement only three days before the parties' departure for the Cayman Islands for their wedding, despite wife's mixed reactions to the requirement of an agreement in the parties' prior discussions. Second, the parties' families had already paid for, and some had already started, their travels to the wedding site. Third, husband was clear in conversations with wife that if wife did not sign the agreement there would be no wedding, and the district court found husband's testimony that the agreement was negotiable not credible. Fourth, wife tried to meet with her attorney from a previous matter but was unable to do so. Fifth, wife was previously unaware of husband's net worth or assets as husband had intentionally kept financial information from her.

As found by the district court, husband "used the wedding deadline to create an atmosphere of pressure that resulted in the [wife] not having an adequate opportunity to negotiate any of the terms of the premarital agreement." And the record shows that husband did so even though he had spent a month communicating with his lawyer and revising the agreement before presenting it to wife. The findings of fact supporting the district court's determination that wife was subject to coercion and duress are supported by the record.

Certainly, the fact that wife was advised of her rights by a lawyer (even if not her preferred lawyer) weighs in favor of validity of the agreement. However, the issue of unfair influence or duress is also relevant, and the district court's findings touching on that issue are supported by the record. Under *Kinney*'s multifactor procedural-fairness test, we are

15

not left with the firm and definite conviction that the district court erred. *See Goldman v. Greenwood,* 748 N.W.2d 279, 284 (Minn. 2008) ("Findings of fact are clearly erroneous where an appellate court is left with the definite and firm conviction that a mistake has been made." (quotation omitted)). And because a lack of procedural fairness is fatal to the validity of the agreement, we affirm the district court's decision invalidating the antenuptial agreement.

**II.    The district court did not abuse its discretion in its award of marital property.**

Husband argues that the district court abused its discretion in awarding wife $750,000 as part of its equitable division of the marital estate. The district court has broad discretion over the division of marital property. *Sirek v. Sirek*, 693 N.W.2d 896, 898 (Minn. App. 2005). We will not alter a property division "absent a clear abuse of discretion or an erroneous application of the law," even if we would have taken a different approach. *Id.* This court will affirm a district court's division of property if that division has "an acceptable basis in fact and principle." *Antone v. Antone*, 645 N.W.2d 96, 100 (Minn. 2002).

Minn. Stat. § 518.58, subd. 1 (2016), provides that a district court "shall make a just and equitable division of the marital property of the parties" after considering several factors. Those factors include "the length of the marriage, any prior marriage of a party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, needs, opportunity for future acquisition of capital assets, and income of each party." *Id.* The district court must consider the value of services provided by either spouse "as a homemaker." *Id.* Additionally, for purposes of equitable

16

division of the marital estate, "[i]t shall be conclusively presumed that each spouse made a substantial contribution to the acquisition of income and property while they were living together as husband and wife." *Id*.

The district court found that the value of the marital estate was $1,898,516. The court found that the best evidence of the estate's value was a December 2009 balance sheet dated shortly before the parties separated in 2010 and signed by both parties, identifying the parties' assets and liabilities. From that balance sheet, the court determined the parties' net worth. The court then subtracted from that amount the value of nonmarital assets husband had brought to the marriage. The net result was the value of the marital estate. Husband argues that "the best evidence of the value of the parties' marital estate is not the December 2009 balance sheet," but he does not identify better evidence to determine the marital estate's value. We conclude that the district court's finding is supported by the record.

The district court also determined that in 2012, during the pendency of the divorce proceedings, husband liquidated approximately $1.5 million in stored grain,

> claiming that he lost financing and had to reduce his operation from 3100 acres to 172, but avoided characterizing that as income for taxes due to accelerated depreciation on equipment that obviously used [sic] to farm ground for his father, as it was not necessary for farming a reduced sized operation of 172 acres or so.

The district court found husband's explanation for downsizing his farming operation in 2012 not credible and not supported by the evidence. The court concluded that husband violated Minn. Stat. § 518.58, subd. 1a, by "transferring or disposing of marital assets not

17

in the usual course of business by liquidating $1,500,000.00 in grain in 2012 and converting a portion of the proceeds to equipment and building, and using inputs in the sum of $1,600,000.00 to grow, cultivate, and harvest the crops of another in 2012," without the consent of wife.

The district court additionally concluded that "[husband] shall pay [wife] as and for equitable division of marital property the sum of $750,000.00." In its memorandum attached to its order, the court explained that wife "is entitled to half of the fraudulently transferred or disposed of grain sales, or $750,000, as a fair and equitable division of the marital property of the parties, and as compensation to [wife] for [husband's] diversion of marital assets without her permission or consent."

While the record contains conflicting evidence as to whether husband's 2012 conduct constituted a dissipation of marital assets, we need not decide whether the district court's finding of dissipation was clearly erroneous. Husband argues that the district court's dissipation determination was error, but he does not demonstrate how the value of the marital estate would materially change without the dissipation determination. As explained by the dissent, if this transaction is not dissipation, it is zero-sum, and therefore has no effect on the value of the marital estate. As the appellant, it is husband's burden to demonstrate not only that the district court's resolution of the dissipation issue was error, but also that this error resulted in a prejudicial change to value of the marital estate. *See* Minn. R. Civ. P. 61 (requiring appellate courts to ignore harmless error); *Johnson v. Johnson*, 277 N.W.2d 208, 211 (Minn. 1979) ("Exactitude is not required of the [district]

18

court in the valuation of assets in a dissolution proceeding; it is only necessary that the value arrived at lies within a reasonable range of figures.").

The district court concluded that wife was entitled to $750,000 as a fair and equitable division of marital assets *and* as compensation for husband's diversion of assets. We need not examine the validity of the district court's underlying reasons for choosing $750,000 as the exact figure if we determine that husband failed to prove that the figure does not represent an equitable division of the marital estate. *See Katz v. Katz*, 408 N.W.2d 835, 839 (Minn. 1987) ("[Appellate courts] will not reverse a correct decision simply because it is based on incorrect reasons."). Based on the conclusive statutory presumption that wife substantially contributed to the acquisition of income and property during the marriage, and the district court's findings that wife worked throughout the marriage both on the farm and as a homemaker, we cannot conclude that a division of the marital estate that awards wife approximately 40% of the marital estate is a clear abuse of discretion with no basis in fact or principle.

III. **The district court did not err in awarding temporary rehabilitative spousal maintenance, but did err in determining its award of permanent spousal maintenance.**

Husband argues the district court also abused its discretion by awarding wife both temporary rehabilitative and permanent spousal maintenance. Minn. Stat. § 518.552, subd. 2 (2016), authorizes a district court to grant maintenance to either spouse "in amounts and for periods of time, either temporary or permanent, as the court deems just." The statute explicitly rejects a presumption for temporary awards, instead instructing that in the case of "uncertainty as to the necessity of a permanent award, the court shall order a permanent

award leaving its order open for later modification." Minn. Stat. § 518.552, subd. 3 (2016). The district court "has broad discretion in deciding whether to award maintenance and before an appellate court determines that there has been a clear abuse of that discretion, it must determine that there must be a clearly erroneous conclusion that is against logic and the facts on record." *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn. 1997).

As a threshold matter, husband argues that wife waived her rights to spousal maintenance during her testimony at the 2011 hearing on the validity of the antenuptial agreement. However, from our review of the record, it does not appear that husband raised this issue during the trial. Thus, the issue of waiver of spousal maintenance is not properly before us. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) ("A reviewing court must generally consider only those issues that the record shows were presented and considered by the [district] court in deciding the matter before it." (quotation omitted)).[6]

The district court awarded wife temporary rehabilitative spousal maintenance in an amount of $1,725 per month for the period from the parties' separation until the court's order. Because five years had already passed, the monthly award was converted to a liquidated payment of $103,500. In addition to the lump-sum rehabilitative maintenance, the district court also awarded wife $862 per month in permanent maintenance, starting the

---

[6] To the extent that husband believes he raised the issue to the district court, the district court, by virtue of awarding spousal maintenance, implicitly found that wife did not waive it, and our review of the 2011 testimony of wife would support such an implicit finding. Wife's 2011 testimony may be fairly read as merely acknowledging that the antenuptial agreement, which she was contesting, included waiver of spousal maintenance, not that wife was waiving her claim to spousal maintenance going forward, irrespective of the agreement.

month of the court's order. The court explained, "[A]lthough [wife] has established a basis for a permanent award of maintenance, she has not demonstrated justification for the figure asserted. The Court has awarded approximately ½ of the temporary amount, or $862.00 per month, as a permanent maintenance amount."

There is ample evidence in the record demonstrating that the district court weighed the appropriate statutory factors and determined that wife met her burden in demonstrating her need for temporary rehabilitative spousal maintenance. The district court addressed the eight factors listed in Minn. Stat. § 518.552, subd. 2(a)-(h), making specific findings for each. For instance, regarding the statutory factor of the financial resources of the parties, the district court found that husband "has significant financial resources due to his successful grain farming operation, and [wife] has limited ability to meet her needs independently." Regarding the statutory standard-of-living factor, the district court found "that the parties lived a high standard of living during their marriage, with living expenses approaching $9,000 a month." In considering the statutory factors of length of marriage and loss of earnings, the district court found that wife "credibly testified that [husband] did not want her working outside the home," causing her "diminishment in some work skills outside the farm." Considering the statutory factors of age and the physical and emotional condition of the spouse seeking maintenance, the district court noted that wife was "44 years old and in reasonable physical and emotional condition." Because the district court exercised its discretion in a manner consistent with the requirements of section 518.552, and because the facts cited in the court's discussion of each of the eight factors have support

21

in the record, we cannot conclude that the award of temporary rehabilitative maintenance from 2010 through the date of the order is clearly erroneous.

With respect to the award of permanent spousal maintenance on a going-forward basis from the date of the order, however, we conclude that the district court's findings are insufficient. Minn. Stat. § 518.552, subd. 1 (2016), allows a district court, in its discretion, to award spousal maintenance if the spouse seeking maintenance:

> (a) lacks sufficient property, *including marital property apportioned to the spouse*, to provide for reasonable needs of the spouse considering the standard of living established during the marriage, especially, but not limited to, a period of training or education, or
> (b) is unable to provide adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment, or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

(Emphasis added.)

As part of the equitable distribution of the marital estate, the district court awarded wife $750,000 in liquid assets. While a spouse is not expected to invade the principal of investments to meet his or her monthly living expenses, Minnesota has "long recognized that a district court must consider all income of the requesting spouse, including income generated from marital property received in the dissolution." *Curtis v. Curtis*, 887 N.W.2d 249, 252 (Minn. 2016). The district court did not include any findings indicating that it took into consideration the income from this liquid asset in its computations of wife's earning potential for purposes of permanent spousal maintenance. It is therefore unclear whether the district court took this income into account.

Therefore, we remand to the district court the issue of permanent spousal maintenance with instructions to recalculate wife's earning potential, taking into consideration potential investment income generated from the marital property distribution, and to adjust the permanent-spousal-maintenance award, if appropriate.

**IV.    The district court did not abuse its discretion in awarding attorney fees.**

Finally, husband argues that the district court abused its discretion when it awarded wife need-based attorney fees.

We review a district court's award of need-based attorney fees for an abuse of discretion. *Gully v. Gully*, 599 N.W.2d 814, 825 (Minn. 1999); *but see* Minn. Stat. § 518.14, subd. 1 (2016) (stating that the district court "shall" award need-based attorney fees if the statutory requirements are met). A district court "shall award attorney's fees, costs, and disbursements in an amount necessary to enable a party to carry on or contest the proceeding" where it finds:

> (1) that the fees are necessary for the good faith assertion of the party's rights in the proceeding and will not contribute unnecessarily to the length and expense of the proceeding;
> (2) that the party from whom fees, costs, and disbursements are sought has the means to pay them; and
> (3) that the party to whom fees, costs, and disbursements are awarded does not have the means to pay them.

Minn. Stat. § 518.14, subd. 1.

Here, the record supports the finding by the district court that wife's attorney fees were necessary for the good-faith assertion of her rights because wife needed to assert her rights to custody, marital property, and spousal maintenance throughout the proceedings.

23

In addition, based on wife's low wages and reliance on government assistance, it was not clear error for the district court to conclude that wife could not pay her own attorney fees. Finally, husband's successful career as a grain farmer, with annual gross income near or greater than $100,000 between 2009 and 2013, indicates that the district court did not err in determining that he could pay attorney fees. As a result, the district court did not abuse its discretion when it awarded wife $168,000 in attorney fees.

## DECISION

Although the district court did not evaluate the procedural fairness of the antenuptial agreement using the proper common-law standard, because the district court's findings of fact support the conclusion that the agreement is invalid under the common-law standard, we affirm the district court's order declaring the antenuptial agreement procedurally invalid. We also conclude that the district court did not abuse its discretion in its equitable division of the marital estate, its determination of temporary rehabilitative spousal maintenance, or its award of need-based attorney fees to wife. However, we remand for additional findings as to wife's earning potential, taking into consideration the marital-property division, and an adjustment of permanent maintenance, if appropriate.

**Affirmed in part, reversed in part, and remanded.**

**HOOTEN**, Judge (concurring in part, dissenting in part)

Because the majority's decision ignores the plain language of Minn. Stat. § 519.11 (2016) and applies a standard that creates a level of uncertainty that is contrary to Minnesota's long history of public policy favoring the validity of antenuptial agreements, *McKee-Johnson v. Johnson*, 444 N.W.2d 259, 265 (Minn. 1989), and because the district court erred in determining that husband dissipated assets, I respectfully dissent in part.

**I.**

*McKee-Johnson* instructs that the validity of an antenuptial agreement executed on or after August 1, 1979, requires "a review of both the procedural and substantive fairness of the contract." 444 N.W.2d at 265. Generally, when the legislature acts to modify the common law, a court interpreting the resulting statute should not assume that the legislature intended to modify the common law "any further than that which is expressly declared or clearly indicated." *Do v. Am. Family Mut. Ins. Co.*, 779 N.W.2d 853, 858 (Minn. 2010) (quotation omitted). After an extensive review of the legislative history of section 519.11, *McKee-Johnson* determined that the statute addresses only procedural fairness. 444 N.W.2d at 264 ("The purpose of the bill was codification of procedural fairness requirements precedent to the execution of a valid antenuptial agreement."). As recognized by the court in *McKee-Johnson*, the statute does not address substantive fairness of the terms of an antenuptial agreement, which must be analyzed under common law principles of contract.[1]

---

[1] The supreme court specifically identified unconscionability as the appropriate standard for substantive fairness review, determining that such a standard "affords proper weight to

"The goal of statutory interpretation is to effectuate the intent of the [l]egislature." *Staab v. Diocese of St. Cloud*, 853 N.W.2d 713, 716 (Minn. 2014). If that intent is clear from the unambiguous language of the statute, we apply the statute according to its plain meaning. *Id*. at 716–17. In the absence of ambiguity, "statutory construction is neither necessary nor permitted." *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001). Appellate courts may not "rewrite a statute under the guise of statutory interpretation*." Laase v. 2007 Chevrolet Tahoe*, 776 N.W.2d 431, 438 (Minn. 2009).

The first sentence of Minn. Stat. § 519.11, subd. 1, provides that an antenuptial agreement executed on or after August 1, 1979, "shall be valid and enforceable if there is . . . a full and fair disclosure of the earnings and property of each party" and "the parties have had an opportunity to consult with legal counsel of their own choice." There is no language in this first sentence that limits its application to antenuptial agreements governing nonmarital property or excludes antenuptial agreements governing marital property from the scope of the statute.

Rather, the expansive nature of the statute—and its application to all antenuptial agreements—is further illustrated by the third sentence of the statute, which provides, "*This section shall not be construed to make invalid or unenforceable* any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section." (Emphasis added). As indicated by

the freedom of contract concept by indication that mere or slight unfairness or one-sidedness is insufficient to justify invalidation." *Id*. at 267 n.7.

the emphasized language in the first clause, this sentence operates as a savings provision that a court should only turn to in circumstances where the statute would otherwise invalidate an antenuptial agreement—when the circumstances underlying the execution of the agreement fail to conform to the disclosure-and-access-to-counsel standard in the first sentence. As is clear from the plain language of the statute, when the statutory requirements of procedural fairness are not met, a court must apply the common law to determine the procedural fairness of an antenuptial agreement.

Nothing in *McKee-Johnson* undermines this reading of the plain language of the statute. In order to understand the supreme court's decision in *McKee-Johnson*, it must be read in context with this court's decision in that case. In *McKee-Johnson*, this court held that section 519.11 operated to void provisions of antenuptial agreements addressing marital property. 429 N.W.2d 689, 693–94 (Minn. App. 1988). The supreme court rejected that legal premise and vacated this court's opinion. 444 N.W.2d at 261, 264–65. In so doing, the supreme court highlighted the public policy in favor of enforcement of antenuptial agreements, including agreements containing provisions relating to marital property, both under the common law and in the legislative history of section 519.11. *Id* at 264–65. In reaction to this court's opinion, the supreme court answered the question of whether the provisions of an antenuptial agreement relating to marital property are void as a matter of law, but did not directly address the question presented in this case: whether the procedural fairness of provisions relating to marital property are evaluated under the disclosure-and-access-to-counsel standard provided by the statute or under the common law.

The supreme court did not decide this issue because it believed that the factors to be evaluated under the statute and under the common law were "substantially identical" and that the statute embodied the common law.[2] *Id.* at 265. In determining that the provisions of the antenuptial agreement governing marital property were executed in a manner that was procedurally fair, the supreme court considered whether there was full financial disclosure between the parties and whether the parties each had access to advice from independent counsel, the same factors that are provided by section 519.11. *Id.* at 265–66. Importantly, contrary to the position of the majority, the supreme court, by applying the two statutory factors, *did not* hold that only the common law applies when determining whether the provisions of an antenuptial agreement relating to marital property are executed in a procedurally fair manner.

The majority notes that the supreme court stated that "to determine whether the provisions of this contract relating to 'after acquired' property are valid and enforceable, we must look to our common law for guidance." *Id.* at 265. The majority is mistaken in believing that this quote reflects the holding of the case; if this were the holding, the supreme court would not have addressed the issue of whether the criteria for evaluating procedural fairness were identical under the statute and the common law. Two of the

---

[2] Unlike in the instant case, where there is no dispute that wife consulted with independent counsel of her own choosing, there was a question as to whether the wife in *McKee-Johnson* had "an opportunity" to consult with independent counsel. By deciding that there was no difference in the statutory and common law requirements of procedural fairness, the supreme court, by simply holding that she waived her opportunity to consult with counsel, did not need to address the issue of whether it was proceeding under the first sentence or the third sentence of the statute in determining whether the antenuptial agreement was procedurally fair.

supreme court's syllabi points set forth its holding in *McKee-Johnson*: (1) "[p]rovisions in an antenuptial agreement [are] not void and unenforceable as a matter of law solely because they relate[] to distribution of marital property upon termination of the marriage"; and (2) "[an] [a]ntenuptial agreement voluntarily entered into by competent adult parties following full financial disclosure and opportunity to consult with independent counsel [meets] common law and statutory standards of procedural fairness." *Id.* at 260.

The quote relied on by the majority must be read within the context of the issue that was presented to the court, i.e., whether the provisions of an antenuptial agreement entered into after the enactment of section 519.11 purporting to address marital property were void as a matter of law. In response to that issue, the supreme court explained immediately following the quote that such antenuptial agreements were valid even under the common law, as long as they were procedurally fair. *Id.* at 265.

The majority's reading of section 519.11 and the supreme court's decision in *McKee-Johnson*, requiring that the procedural fairness of provisions of an antenuptial agreement relating to marital property be evaluated under the common law, implicates three possible analyses. One possible analysis is that the statute governs nonmarital property, while the multifactor balancing test from the common law as provided in *In re Estate of Kinney*, 733 N.W.2d 118, 124 (Minn. 2007), governs marital property, creating two separate standards governing procedural fairness for a court to apply if the agreement contains both marital and nonmarital property. Under such an analysis, it would be possible for a court, evaluating the *same* circumstances surrounding the creation and execution of the *same* agreement, to determine that a spouse had been afforded procedural

fairness regarding the provisions of the agreement relating to nonmarital property but not those relating to marital property, or vice versa. This standard for determining procedural fairness could lead to illogical results, and would be unnecessarily confusing and unworkable.

Another possible analysis indicated by the majority's interpretation of section 519.11 and *McKee-Johnson* is that the common law applies in evaluating the procedural fairness of the agreement, regardless of whether the agreement addresses marital property, nonmarital property, or both. However, such an analysis would render the statute's decree that an antenuptial contract "shall be valid" as long as there was disclosure and access to counsel meaningless, eviscerating the statute and violating the statutory provision that in determining legislative intent courts are to presume that the legislature intended "the entire statute to be effective and certain." Minn. Stat. § 645.17(2) (2016).

This analysis would also be an absurd reading of *McKee-Johnson*, as that decision did not address nonmarital property. 444 N.W.2d at 262 n.2. The *McKee-Johnson* court noted that "[t]he thrust of the bill [that became section 519.11] was . . . to make it more difficult to subsequently challenge the validity of an antenuptial agreement covering nonmarital property."[3] *Id.* at 264. There is nothing in *McKee-Johnson* that dictates the application of the common law to all antenuptial agreements, even those containing only provisions addressing nonmarital property, to the exclusion of the application of the statute.

---

[3] Though recognizing that part of the "thrust of the bill" related to nonmarital property, the supreme court "[found] nothing in the legislative history which indicates that the statute was hostile towards agreements which contained provisions relative to the disposition of marital property." *Id.* at 264.

In fact, as indicated by the *McKee-Johnson* court's examination of the legislative history, the legislature specifically intended that section 519.11 govern the procedural fairness analysis of agreements pertaining to nonmarital property. *Id.*

A third possible analysis, apparently adopted by the majority, is that the common law applies to all of the provisions in an antenuptial agreement if the agreement contains any provision addressing marital property. However, this analysis suffers from many of the same flaws as the previous analyses. Such an analysis rewrites the statute to say that "an antenuptial contract *that does not contain any provisions addressing marital property*" shall be valid if the disclosure-and-access-to-counsel standard is met. As described above, nothing in *McKee-Johnson* indicates that the supreme court interpreted the statute to require that the common law be consulted to determine the procedural fairness of any antenuptial agreement addressing marital property, much less provisions of an antenuptial agreement pertaining to nonmarital property. Furthermore, this analysis would also eviscerate section 519.11, as the statute would only apply to antenuptial agreements solely addressing nonmarital property. Such agreements are likely uncommon, given that nonmarital property owned by one spouse is generally not awarded to the other spouse. *See* Minn. Stat. § 518.58, subd. 1, 2 (2016) (providing that, while a district court "shall make a just and equitable division of the marital property," a district court may only apportion up to one-half of a spouse's nonmarital property to the other spouse if the spouse's resources or property, including the spouse's portion of the marital property, "are so inadequate as to work an unfair hardship").

Any of the analyses implicated by the majority's reading of the statute and *McKee-Johnson* would invite parties to litigate every antenuptial agreement addressing marital property, in contravention of the legislature's intent in enacting the statute. As stated above, "[t]he goal of statutory interpretation is to effectuate the intent of the [l]egislature." *Staab*, 853 N.W.2d at 716. Given the long history of public policy in Minnesota favoring the enforceability of antenuptial agreements covering both marital and nonmarital property,[4] I cannot support an interpretation of section 519.11 that implies the legislature intended to create this level of uncertainty for attorneys, courts, and most importantly, couples preparing for marriage.

The statutory interpretation adopted by the majority effectively eviscerates or rewrites the first sentence of the statute. Because we may not "rewrite a statute under the guise of statutory interpretation," *Laase*, 776 N.W.2d at 438, I would apply the statute as written. As dictated by the plain language of the statute, I would apply the procedural fairness standard in the first sentence of section 519.11 to all antenuptial agreements executed on or after August 1, 1979. I would only resort to the common law when the third sentence of the statute is invoked—when application of the first sentence would otherwise invalidate an agreement.

---

[4] *See McKee-Johnson*, 444 N.W.2d at 265 (stating, after extensive review of cases, that "premarital agreements, if fairly arrived at, following full disclosure of financial condition, and with opportunity to consult independently with counsel, have been favored in the common law of Minnesota—even though marital property was included within their scope").

Applying the statutory procedural fairness standard to all antenuptial agreements, regardless of the type of property covered, affords a higher degree of certainty to both parties seeking to structure their financial affairs in advance of their marriage and the attorneys who advise them. *See* Minn. Stat. § 645.17 (2) (providing that courts should assume legislature intends statutes to be "effective and certain"). It also offers a much easier standard for courts to apply in evaluating the procedural fairness of antenuptial agreements and discourages speculative litigation. Finally, this interpretation avoids the possibility of unreasonable and inconsistent results, such as would result from the application of two different standards regarding the procedural fairness of an antenuptial agreement. *See id.* (1) (2016) (providing that courts should assume legislature does not intend results that are unreasonable).

Because the district court considered factors other than those required by section 519.11 and the undisputed facts of this case demonstrate that the antenuptial agreement meets the requirements of section 519.11, I would reverse the district court's determination that this antenuptial agreement was executed in a procedurally unfair manner. Further, because substantive fairness of an antenuptial agreement must be evaluated based on the terms of the agreement and the district court did not consider the terms when it found the agreement was substantively unfair, I would reverse the district court's substantive fairness determination and remand with instructions to evaluate the agreement's terms and enforce the terms that are substantively fair.

# I.

I also cannot concur with the majority's decision to affirm the district court's equitable division of property because the district court erred in determining that husband dissipated assets during the divorce proceedings.

Minn. Stat. § 518.58, subd. 1a (2016) provides that:

> If the court finds that a party to a marriage, without consent of the other party, has in contemplation of commencing, or during the pendency of, the current dissolution . . . disposed of marital assets except in the usual course of business or for the necessities of life, the court shall compensate the other party by placing both parties in the same position that they would have been in had the . . . disposal not occurred.

Here, the district court made a factual finding that in 2012 husband "liquidated his crop inventory," which was worth approximately $1.5 million, and with the proceeds "paid off his operating loan, and converted the balance of the proceeds to new equipment, which he used to farm the same property with his father being the farmer of record." Based on this finding, the district court concluded that the liquidation of stored crops was a dissipation of marital assets and that wife was "entitled to half of the fraudulently transferred or disposed of grain sales, or $750,000, as a fair and equitable division of the marital property of the parties, and as compensation . . . for [husband's] diversion of marital assets."

We have defined dissipation as "frivolous, unjustified spending of marital assets." *Volesky v. Volesky*, 412 N.W.2d 750, 752 (Minn. App. 1987). The statute exempts spending "in the usual course of business." Minn. Stat. § 518.58, subd. 1a. Thus, to the extent that husband used the proceeds from the sales of an asset from the farm operation to

pay off the liabilities of the farm operation or to purchase equipment or farm inputs[5] owned by the farm operation, I see this as a zero-sum transaction, which has no effect on the overall net value of the farm operation. *See Bollenbach v. Bollenbach*, 285 Minn. 418, 435, 175 N.W.2d 148, 159 (1970) ("If the transaction is to be overlooked for purposes of establishing defendant's net worth, both asset and liability must be deleted to avoid punitive consequences.").

However, the district court also made findings of fact that husband used some of the proceeds of the 2012 crop liquidation to purchase farm inputs that were then provided to his father without compensation. While use of the proceeds of the 2012 crop liquidation that were used to pay legitimate farm debts or used to purchase equipment owned or farm inputs utilized by the farm operation was not a dissipation of marital assets, to the extent that those proceeds were used to purchase farm inputs that were expended by appellant to farm his father's land without compensation, those expenditures were a dissipation of marital assets.

While it is true that a district court is not required to be exact in its valuation of the marital estate, *Johnson v. Johnson*, 277 N.W.2d 208, 211 (Minn. 1979), it is impossible to determine from the district court's findings what effect its error in determining dissipation had on the valuation of the marital estate. Therefore, even if I agreed with the majority that the antenuptial agreement was invalid, I would nevertheless reverse the district court's

---

[5] According to wife's expert, farm inputs include seeds, fertilizer, pesticides, and other consumable products that are essential in any farm operation.

property division and remand for a recalculation and equitable division of the marital estate.

## III.

Assuming arguendo that the district court properly determined that the antenuptial agreement is invalid, I concur with the majority's conclusions regarding spousal maintenance. Regardless of the validity of the antenuptial agreement, I concur with the majority's conclusion regarding need-based attorney fees.